710 A.2d 944 (1998)
120 Md. App. 590
ACANDS, INC., et al.
v.
ABATE, et al.
No. 1857, Sept. Term, 1996.
Court of Special Appeals of Maryland.
January 7, 1998.
Reconsideration Denied May 21, 1998.
*945 *946 *947 *948 *949 Deborah L. Robinson (Peter A. Woolson, Karen J. Detling and Kenny, Vettori & Robinson, P.A., on the brief), Baltimore, for appellant, John Crane Inc.
M. King Hill, III (Cynthia M. Hahn, Venable, Baetjer and Howard, L.L.P., Towson, and Howard Bonfield, Rubin, Baum, Levin, Constant and Friedman, New York City, on the brief), for appellant, Rapid-American Corp.
John J. Nagle, III (R. Scott Krause and Bodie, Nagle, Dolina, Smith & Hobbs, P.A., on the brief), Towson, for appellant, E.L. Stebbing & Co.
Patrick J. Attridge (King & Attridge, on the brief), Rockville, for appellant U.S. Mineral.
Robert J. Lynott, Peter W. Taliaferro and Thomas & Libowitz, P.A., on the brief, Baltimore, for appellant Hampshire Industries.
*950 Michael T. Ward and Edward J. Lilly (Theodore M. Flerlage, Jr., Steven W. Smith, Thomas P. Kelly and the Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellees.
Argued before WENNER and THIEME, JJ., and ROBERT F. FISCHER, Judge (retired), Specially Assigned.
ROBERT F. FISCHER, Judge (retired), Specially Assigned.
The appeal before us is from the second major consolidated trial in the Circuit Court for Baltimore City arising from exposure to asbestos-containing products.
The first consolidation, known as Abate I, was tried before the Honorable Marshall A. Levin from February 18, 1992 to August 10, 1992. In that proceeding, the cases of six illustrative plaintiffs were tried to full and final judgments, and certain common issues raised by 8,549 other plaintiffs, who filed suit prior to October 1, 1990, were also tried. Those common issues were, in essence, whether the defendants manufactured, sold, distributed, or installed defective products, whether the defendants had and violated any duty to warn of dangers inherent in the products, and whether the defendants could be found liable for punitive damages. Whether the common issue plaintiffs were actually exposed to and damaged by the products was to be determined at subsequent "mini-trials."
Although more than 100 defendants were named in Abate I by combinations of the illustrative plaintiffs and common issue plaintiffs, the claims against all but 15 of the defendants were dismissed prior to trial. A variety of cross-claims and third-party claims were filed among the various trial defendants and settling defendants. Judge Levin severed all but two of those claims from the case, to be tried in a subsequent, related proceeding.[1] During trial, nine of the defendants settled, leaving the number of defendants against whom verdicts were actually sought at six.
Ultimately, in Abate I, the jury found in favor of three of the illustrative plaintiffs and against the other three. On the common issues, the jury found six defendants and one cross-claim defendant negligent and strictly liable. It found four defendants liable for punitive damages, but one of those defendants settled and another was dismissed from the case after filing for bankruptcy. On appeal, the Court of Appeals reversed the punitive damages findings and affirmed in part and reversed in part the awards of compensatory damages to the trial plaintiffs. See Godwin, 340 Md. 334, 667 A.2d 116.
The case now before us, known as Abate II, was tried before the Honorable Richard T. Rombro. In accordance with a plan initiated by Judge Levin and modified by Judge Rombro and, apparently, The Honorable Joseph H.H. Kaplan, Administrative Judge, Abate II tried the cases of five trial plaintiffs [2] to full and final judgments.[3] It also tried: common issues, identical to those common issues tried in Abate I, as to approximately 1,300[4] cases filed between October 1, 1990 and October 1, 1993; the cross-claims and third-party claims severed from the Abate I proceeding; and cross-claims and third-party claims from Abate II. As in Abate I, the cases of the common issue plaintiffs are to be finally adjudicated at mini-trials.
*951 The five trial plaintiffs in Abate II (hereinafter referred to collectively, at times, as the "appellees"), all of whom were represented by counsel from the same law firm, were John Joseph Goodman, Leonard Ciotta, Frederick Glensky, Carroll Morrow, and Terry Theis.[5] They, and the estimated 1,300 common issue plaintiffs, filed claims for negligence and strict liability against numerous defendants. While the parties do not specify precisely how many defendants were originally named in the suits and how many were dismissed or settled before or during trial, and we cannot glean that information from the record extract, we determine that verdicts were ultimately sought against 11 defendants, including the five appellants in the appeal now before us: Rapid-American Corporation (hereinafter "Rapid"), a successor in interest to Philip Carey Manufacturing Company; John Crane, Inc. (hereinafter "Crane"), a manufacturer of pipe-sealing products; U.S. Mineral Products Company (hereinafter "U.S. Mineral"), a manufacturer of fire-proofing spray; E.L. Stebbing & Co., Inc. (hereinafter "Stebbing"), a contracting company; and Hampshire, Industries, Inc. (hereinafter "Hampshire"), also a contracting company.[6] Verdicts were also sought against 14 cross-defendants or third-party defendants.
Judge Rombro divided Abate II into three phases. Phase I began on June 22, 1994, with closing argument ending on December 1, 1994. In Phase I, all of the issues with respect to the five trial plaintiffs were tried. In addition, the common issues regarding any other defendants named by any of the approximately 1,300 common issue plaintiffs were tried, as were the cross-claims and third-party claims against all Phase I defendants. Any defendant that settled with plaintiffs prior to or during Phase I was removed from Phase I to Phase II if that defendant was the subject of a cross-claim.
On December 2, 1994, at the conclusion of Phase I, all of the issues tried in that phase were submitted to the jury. In addition to its common issue findings, the jury found in favor of all five of the trial plaintiffs. It awarded damages to the trial plaintiffs as follows:
- Goodman - total compensatory award of $9,000,000.00, consisting of $3,000,000.00 for personal injuries, $1,000,000.00 for injury to the marital relationship, and $5,000,000.00 to Irene Goodman as surviving spouse.
- Ciotta - total compensatory award of $500,000.00 for personal injuries.[7]
- Glensky - total compensatory award of $1,100,000.00, consisting of $1,000,00.00 for personal injuries and $100,000.00 for injury to the marital relationship.
- Morrow - total compensatory award of $7,000,000.00, consisting of $6,000,000.00 for personal injuries and $1,000,000.00 for injury to the marital relationship.
- Theis - total compensatory award of $2,500,000.00 consisting of $2,000,000.00 for personal injuries and $500,000.00 for injury to the marital relationship.
The amounts of the judgments entered against the defendants were affected by the terms of settlements made prior to and during trial. In light of the settlements, Judge Rombro determined a specific number of joint tortfeasor shares as to each plaintiff, with shares attributable to each judgment defendant and each settling defendant. Each judgment defendant was jointly and severally liable to a particular plaintiff only *952 for the number of shares to be paid to that plaintiff by the total number of judgment defendants. Judgment defendants were not jointly and severally liable for those shares of the settling defendants, as those shares were satisfied by the amounts of consideration paid for the settlements.[8]
All five of the appellants were found liable to some combination of trial plaintiffs. Rapid was found liable to Goodman and Ciotta. Crane was found liable to Glensky, Morrow, and Theis. U.S. Mineral and Hampshire were found liable to Goodman, Glensky, Morrow, and Theis. Stebbing was found liable to Glensky and Theis.
Phase II of Abate II commenced on January 4, 1995 before the same jury, and the presentation of evidence took 11 days. In Phase II, cross-claims and third-party claims from both Abate I and Abate II were tried. Such claims included, inter alia, indemnity claims against defendants who were dismissed from Abate I or who settled with plaintiffs in either Abate I or Abate II[9].
Before submitting the Phase II issues to the jury, Judge Rombro proceeded on to Phase III. In that final phase, evidence was presented from which the jury could determine, as to those defendants who were found potentially liable in Phase I for punitive damages, the amount of punitive damages to be awarded for each dollar of compensatory damages. The presentation of evidence in Phase III lasted only one day. The Phase II and Phase III issues were then submitted to the jury and, on February 17, 1995, the jury returned its verdicts.
A flurry of post-trial motions followed, most of which were denied. Notably, however, Judge Rombro eliminated most punitive damages awards by: granting appellant Rapid's motion for judgment notwithstanding the verdict as to punitive damages for the actions of its corporate predecessor prior to 1963; granting Phase I defendant Westinghouse Electric Corporation's motion for judgment notwithstanding the verdict as to punitive damages; and granting the motion for judgment notwithstanding the verdict of Phase I defendant Harbison-Walker as to all punitive damages and as to compensatory damages in favor of Goodman and Ciotta.[10]
*953 Many of the Phase I and Phase II defendants then noted appeals to this Court. Several pre-hearing conferences were held and, ultimately, a three-judge panel of this Court issued a written order by which it defined the parameters of this appeal. See PHC No. 618, September Term, 1995 (filed April 18, 1996). Writing for the panel, former Chief Judge Wilner explained:
In Shenansky [Shenasky] v. Gunter, 339 Md. 636, 638 [664 A.2d 882] (1995), the Court confirmed that "[i]n an action for money damages, an order which decides that there is liability, or which resolves some liability issues in favor of a party seeking damages, but fails to make a determination with regard to the amount of damages, does not dispose of an entire claim and cannot be made final and appealable under Rule 2-602(b)." In such a case, the appellate court has no choice but to dismiss the appeal, which is what the Court did in Shenansky [Shenasky]. That principle was applied in [ACandS v. Godwin, 340 Md. 334, 667 A.2d 116 (1995) (reviewing Abate I) ] when the Court dismissed the appeal of Owens-Illinois, which had been taken from the Phase I verdict resolving some liability issues against it.
Id. at 6. The panel concluded that only the appeals filed by Rapid, Crane, U.S. Mineral, Stebbing, and Hampshire from the final judgments in the cases of the five trial plaintiffs could proceed. Id. at 6-7.
Pursuant to a subsequent order of this Court filed on October 31, 1996, four of the five appellantsRapid, Crane, U.S. Mineral, and Stebbinghave filed a joint brief in which they set forth arguments common to all of the appellants. See PHC No. 618, September Term, 1996 (filed October 31, 1996). Hampshire did not join in the brief but has adopted it "to the extent not inconsistent with [its] positions."[11] In addition, each of the five appellants have filed briefs setting forth their own specific arguments on appeal.[12]
We address first the arguments set forth in the joint brief. Specifically, the appellants [13] argue in their joint brief that:
*954 I. The Abate II consolidated trial violated Md. Rule 2-503 and due process principles guaranteed by the Fourteenth Amendment to the Constitution of the United States, in that:
A. The trial was unduly confusing and prejudicial because of:
1. the large number of defendants, products, and claims involved,
2. the nature of the phasing and the lack of distinction between the phases, such as the participation of the cross-plaintiffs and third-party plaintiffs in Phase I, and
3. the court's decision to permit the plaintiffs to select all five of the trial plaintiffs,
B. The verdict forms referred to product categories rather than to specific brand names, and
C. The jury returned a number of erroneous verdicts that reflected its confusion.
II. The appellants were denied their right to a fair and impartial jury, in that:
A. The trial court dismissed a majority of the venire for hardship reasons without verifying that there were, in fact, any hardships and without regard to the effect of the dismissal on the composition of the jury pool,
B. The plaintiffs improperly exercised their peremptory challenges to strike potential jurors on the basis of race, and
C. The trial court refused to conduct voir dire and refused to declare a mistrial after the plaintiffs engaged in an ex parte communication with the jury.
All of the appellants mount individual challenges to the sufficiency of the evidence to support the various judgments in favor of the trial plaintiffs, which we shall address in part III herein. In particular:
III. A. Rapid, U.S. Mineral, and Hampshire contend that the evidence was insufficient to support the judgments in favor of Goodman,
B. Rapid contends that the evidence was insufficient to support the judgment in favor of Ciotta,
C. Crane, U.S. Mineral, Stebbing, and Hampshire contend that the evidence was insufficient to support the judgments in favor of Theis,
D. Crane, U.S. Mineral, Stebbing, and Hampshire contend that the evidence was insufficient to support the judgments in favor of Glensky, and
E. Crane, U.S. Mineral, and Hampshire contend that the evidence was insufficient to support the judgments in favor of Morrow.
The appellants lodge additional challenges as well. Rapid contends that:
IV. The judgments against it should be reversed because Judge Rombro refused to strike evidence that had not been disclosed during pretrial discovery, and
V. The awards to Goodman and Ciotta were "grossly excessive" or, in the alternative, the award to Ciotta should have been reduced in conformance with the statutory cap.
Stebbing and Hampshire assert that:
VI. Judge Rombro erred in instructing the jury on the duties of nonmanufacturing suppliers and installers, and
VII. Judge Rombro erred by refusing to instruct the jury that strict liability does not apply where the predominant purpose of the defendant's conduct was provision of a service rather than the sale of goods.
To that end, Hampshire further contends that the evidence was insufficient to establish that it was a seller of goods.
U.S. Mineral contends that:
VIII. Judge Rombro erred by refusing to instruct the jury that a duty to warn of the hazards of asbestos might be discharged by warning or instructing a reliable third-party intermediary.
We find no merit in the joint arguments as to the propriety of the consolidation and the fairness and impartiality of the jury, although we do find that several of the dates of liability on the common issue verdict sheets require reformation by the trial court. We agree that the evidence was insufficient to establish that U.S. Mineral or Stebbing were liable to any of the appellees, or that Hampshire was liable to Goodman or Morrow. We *955 therefore reverse all of the judgments obtained by trial plaintiffs against U.S. Mineral and Stebbing, and the judgments of Goodman and Morrow against Hampshire. We further agree that the award to Ciotta must be reduced in conformance with the statutory cap. Finally, we agree that Judge Rombro erred in refusing to grant Hampshire's request that he instruct the jury on the predominant purpose test. We shall not address U.S. Mineral's argument regarding Judge Rombro's failure to give a jury instruction regarding a warning to a reliable third-party intermediary, as we find that the evidence against U.S. Mineral was insufficient and the instruction urged would not apply to any other appellant.[14] Similarly, we shall not address the additional arguments made by Stebbing, although we address them to the extent that they are made by Hampshire as well.[15]

- JOINT ARGUMENTS -

I

THE CONSOLIDATION
Maryland Rule 2-503(a)(1) provides: "When actions involve a common question of law or fact or a common subject matter, the court, on motion or on its own initiative, may order a joint hearing or trial or consolidation of any or all of the claims, issues, or actions." Any such consolidation, of course, must comport with due process principles. See U.S. Const. amend. XIV, § 1.
In Godwin, 340 Md. 334, 667 A.2d 116, the Court of Appeals reviewed the Abate I consolidation. As we have observed, that case involved 8,555 plaintiffs8,549 common issue plaintiffs and six illustrative plaintiffsand, ultimately, six judgment defendants. The Court summarized the conduct of the trial as follows:
Judge Levin divided the issues to be decided into four phases, and the court took jury verdicts on special interrogatories for each phase. Phase I decided, as to specific products of each remaining defendant and of the two cross-claim defendants, whether that defendant was negligent and/or strictly liable and, if so, the year in which liability arose and the year in which it may have ended....
Phase II resolved individual issues as to the six illustrative plaintiffs. These issues included: (1) whether the plaintiff was a foreseeable user and/or bystander; (2) whether the plaintiff had contracted an asbestos-related disease and, in the wrongful death cases, whether that disease had caused the death; (3) the years, if any, during which the plaintiff was exposed to the products of specific defendants named in the special verdict form, and (4) for those defendants for which years of exposure were found under issue three, whether that exposure was a substantially contributing factor in causing the asbestos related disease and/or death. The remaining issues in phase II dealt with cross-claims and the amount of compensatory damages.

...
Phases III and IV addressed punitive damages. The punitive damages issues were common issues under the consolidation order....
Id. at 344-45, 667 A.2d 116 (footnotes omitted).
The Court of Appeals concluded that the Abate I consolidation complied with Rule 2-503(a)(1) and the Fourteenth Amendment. It explained:
*956 In an asbestos product liability failure to warn action sounding in strict liability or negligence and brought against a manufacturer or a distributor-installer, a plaintiff must show that the defendant knew or should have known that distribution of the product involved an unreasonable risk of causing physical harm to the consumer.... Thus, absent the consolidation, each of the 8,549 [common issue] plaintiffs would be required to prove state of the art[16] as to [each of the defendants] to that plaintiff's claim. The defendants submit that the 8,555 plaintiffs in the consolidation have different occupations, were exposed at different times, at different workplaces, have different diseases, and different medical histories. But none of these factors diminishes the commonality of the Phase I [common] issues, and the Phase I [common issue] determinations are the only determinations that will be applied against the defendants-appellants at mini-trials of the other plaintiffs' actions.
Issues involving a plaintiff's burden on state of the art in an asbestos products liability failure to warn case are particularly appropriate for consolidations. Absent unusual circumstances, it is senseless to repeat the presentation of the same evidence against the same defendants in successive, individual trials or mini-consolidations. After only a brief introduction to asbestos litigation one recognizes that the same medical studies, medical journal articles, workers' compensation claims, third-party suits, depositions of witnesses, transcripts of court testimony, minutes of meetings, correspondence, and other exhibits are produced against the same defendants in trial after trial throughout the nation. Indeed, the documents have been photocopied so many times for an ever-expanding distribution among members of the plaintiffs and defense bars that the copies introduced into evidence are nearly illegible.
Id. at 395-96, 667 A.2d 116.
The Court recognized: "The concern of a defendant in an asbestos cases consolidation is that its particular defense may be lost in the mass of evidence. One measure of the volume of evidence that will be introduced is the number of parties." Id. at 402, 667 A.2d 116. It nevertheless rejected the appellants' contentions that the consolidation violated Rule 2-503(a) and due process principles, and opined:
The defendants' principal argument for the unconstitutionality of the consolidation is that the number of parties, the number of issues, and the volume of the evidence make the proceeding so complex and overwhelming that it is beyond the capacity of the jury to resolve the issues on the law and the evidence, with the result that the defendants are deprived of a fair trial. It should be borne in mind, however, that the subject consolidation was not a consolidation of 8,555 cases for resolution of all of the issues in all of the cases in one trial. Because the same evidence that was introduced here would have been introduced if only the actions of the six illustrative plaintiffs had been tried, the merits of defendants' complexity argument should be tested, not by the number of parties who will be bound by the determination of common issues, but by the cases addressing the consolidation of multiple asbestos actions for full trial on the merits. The jury in the instant matter dealt with six plaintiffs cases against, initially, twelve defendants. By the time the issues were submitted to the jury, there were only six defendants and two cross-claim defendants.... [C]ourts [in other jurisdictions] have had no difficulty in approving consolidations for full trial on the merits of asbestos actions involving considerably more parties.
Id. at 397-98, 667 A.2d 116.[17]
The joint appellants do not argue that any consolidation of asbestos cases would be improper. *957 Indeed, any such argument would be incompatible with Godwin. Instead, the joint appellants argue that Abate II far exceeded the scope of the consolidation approved in Godwin and failed to employ any of the safeguards that kept Abate I within the guidelines of Rule 2-503 and the Fourteenth Amendment. Contrary to the joint appellants' suggestion, however, the Court of Appeals did not indicate in Godwin that Abate I was the benchmark, defining the outer limits of an acceptable consolidation. The Court expressly recognized that "courts [in other jurisdictions] have had no difficulty in approving consolidations ... involving considerably more parties." 340 Md. at 398, 667 A.2d 116. See, e.g., Jenkins v. Raymark Indus., Inc., 782 F.2d 468 (5th Cir.1986) (approving planned class action against 13 defendants for trial to determine common issues regarding state of the art defense, with claims of ten representatives to be tried in full); In re New York Asbestos Litigation, 145 F.R.D. 644 (approving planned consolidation of claims of 12 plaintiffs, who alleged exposure to asbestos at various worksites, against 88 defendants and third-party defendants for full trial on all issues), upheld upon reconsideration, 149 F.R.D. 490 (S.D.N.Y. 1993) (observing that, due to settlements, the number of expected plaintiffs had been reduced to six, the number of expected defendants had been reduced to 12, and the number of expected third-party defendants had been reduced to two); In re Eastern and Southern Districts Asbestos Litigation, 772 F.Supp. 1380 (E. & S.D.N.Y.1991) (approving consolidated trial of all issues regarding claims of 64 plaintiffs, who alleged exposure to asbestos at Brooklyn Navy Yard over 50-year period, against six defendants), aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litigation, 971 F.2d 831 (2d Cir.1992); West Virginia ex rel. Appalachian Power Co. v. MacQueen, 198 W.Va. 1, 479 S.E.2d 300 (1996) (approving planned consolidation of asbestos-related premises liability claims of about one thousand plaintiffs against 17 owners of 33 premises for trial on common issues); Cimino v. Raymark Indus., Inc., 739 F.Supp. 328 (E.D.Tex.1990) (approving class action tried against several defendants on issues of product defectiveness and punitive damages, with claims of ten representatives having been tried in full); Wilson v. Johns Manville Sales Corp., 107 F.R.D. 250 (S.D.Tex.1985) (approving consolidated trial of asbestos-related claims of 50 plaintiffs against 14 defendants that determined common issues regarding product defectiveness and punitive damages), aff'd 810 F.2d 1358 (5th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); Neal v. Carey Canadian Mines, Ltd., 548 F.Supp. 357 (E.D.Pa.1982) (approving consolidated trial on all issues regarding asbestos-related claims of 15 plaintiffs against six defendants), aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481 (3d Cir.1985); Compare Malcolm, 995 F.2d 346 (invalidating consolidation that involved full trial of claims of 48 plaintiffs against 25 defendants, plus numerous cross-claims and third-party claims, where plaintiffs alleged exposure to asbestos at more than 40 different power-generating stations); Cain v. Armstrong World Indus., 785 F.Supp. 1448 (S.D.Ala. 1992) (invalidating consolidation that involved full trials as to 10 personal injury actions and three wrongful death actions against several manufacturers of asbestos-containing products).

A. Confusion and Prejudice

1. Large Number of Defendants, Products, and Claims
The joint appellants complain that "the Abate II trial exceeded the complexity *958 of Abate I by many orders of magnitude involving, inter alia, significantly more defendants and cross-defendants, shifting and confusing alignments of parties, and a greater number of varied products ranging from refractories to packing materials." The appellants point out that some of the cross-defendants and third-party defendants were not named in the plaintiffs' suits. They assert that Abate I focused upon "traditional" asbestos insulation products, while Abate II involved "diverse products" which required "specific and complicated defenses." The joint appellants conclude that the jury was simply overwhelmed by the number of defendants, cross-defendants, and third-party defendants,[18] and the variety of products.
As we shall discuss in part I.C, infra, the Abate II verdicts do not reflect confusion on the part of the jury. In fact, they reflect that the jury was reasonably competent in distinguishing between each defendant and each product. The joint appellants offer no reason to believe that the jurors were unable to determine what evidence applied to which defendant or cross-defendant. They offer no reason to believe that the jurors could not determine, for example, that certain evidence pertained to a particular defendant's fireproofing spray rather than to another defendant's encapsulated gaskets or refractory bricks. It is significant, as it was in Abate I, that much of the evidence presented applied to all of the various defendants and their products. See 340 Md. at 395-96, 667 A.2d 116.
As the Court of Appeals explained in Godwin, 340 Md. at 398, 667 A.2d 116, and as the above-cited cases illustrate, courts in other jurisdictions have upheld consolidations of equal or greater complexity. Absent some concrete indication that the jury was so overwhelmed that it was unable to do its job, the contentions of the joint appellants are unconvincing.

2. Phasing of Trial
The joint appellants next contend that, because Abate II was structured differently than Abate I, it was unduly confusing and prejudicial. They point out that Abate I was tried in four phases, while Abate II was tried in three phases. The implication is that the various claims and defendants were neatly separated in Abate I, but were jumbled together in Abate II.
In fact, the phasing of the two trials was more similar than the joint appellants would have us believe. As we have indicated, in Abate I, the common issues as to all of the defendants and the two cross-defendants that had settled with the trial plaintiffs were decided in Phase I. The remaining issues regarding the illustrative plaintiffs were decided in Phase II, and issues regarding punitive damages were addressed in Phases III and IV.
In Abate II, Phase I involved: the common issues as to all of the defendants named by the trial plaintiffs and common issue plaintiffs; cross-claims and third-party claims against any of the Phase I defendants who did not settle with the plaintiffs prior to or during trial; and all remaining issues regarding the trial plaintiffs. Phase II involved the cross-claims and third-party claims from Abate I, plus those cross-claims and third-party claims against defendants who were never Phase I defendants or who settled with plaintiffs prior to or during trial. Phase III involved punitive damages.
Thus, in the context of the joint appellants' argument, the significant difference in the phasing of Abate I and Abate II was that Abate II combined, in one phase, the common issue claims against all of the defendants and all of the issues raised by the trial plaintiffs. To some degree in both trials, cross-claims were permitted in phases that involved direct claims by plaintiffs against defendants.
The joint appellants urge that the jury was confused and that all of the defendants were prejudiced by the participation of cross-plaintiffs in Phase I of the trial. They contend that Abate I and Abate II cross-claims, as well as Phase II defendants, were "interjected" into Phase I, thus "overloading the jury *959 with additional defendants, products, and worksites not at issue in any of the claims against Phase I defendants." The joint appellants posit that Judge Rombro could have alleviated the problem somewhat by instructing the jury as to the precise roles of the cross-plaintiffs and by informing it of "various settlements and other secret arrangements between plaintiffs and cross-plaintiffs." They contend that the judge instead exacerbated the problem by suggesting, in his instructions as to Phase I, that the Abate II defendants were as culpable as the cross-plaintiffs, and by permitting the cross-plaintiffs to cross-examine witnesses regarding matters that were of no concern to their own cases.
In opening statements at the start of Phase I, counsel for one of the cross-plaintiffs, Owens-Corning, explained that Owens-Corning was a defendant in Abate I but was now "aligned with the plaintiffs...." Counsel for Pittsburgh Corning explained in opening statement that his client had "stipulated with the plaintiffs in this case that our product is defective." He made clear that the position of the cross-plaintiffs was that "there are a lot of other fish in the sea. There are a lot of other companies who need to step up to that line and take responsibility."
Judge Rombro required each attorney who examined any witness below to identify himself or herself and his or her client. In this way, the judge ensured that the jury was clearly apprised as to precisely who was conducting the examination. Following the presentation of evidence in Phase I, but before the issues were submitted to the jury, Judge Rombro instructed the jury as follows:
Now, in order for you to fully understand what you are deciding in this case, I am going to give you a little background about this trial, some of which you know and some of which you may not know.
This trial is actually part two of a proceeding which began over two years ago.
In the prior proceeding there was a trial during which another jury was asked to decide whether the products of Pittsburgh Corning, Porter-Hayden, ACandS [three of the four cross-plaintiffs/third-party plaintiffs] and other companies were defective and unreasonably dangerous.
The trial took several months, just as this one has.
The jury in that prior trial determined the asbestos products of Pittsburgh Corning, Porter-Hayden and ACandS were defective and unreasonably dangerous.
That finding against Pittsburgh Corning, Porter-Hayden and ACandS applies to all of the asbestos cases before you.
In this trial you must decide whether the products of other defendants are defective and unreasonably dangerous.
Pittsburgh Corning, Porter-Hayden and ACandS claim that the products of these other companies are also defective and may have contributed to causing injury in the asbestos cases before you.
Now, Owens-Corning [the fourth cross-plaintiff/third-party plaintiff] was sued by plaintiffs and was a defendant in thousands of cases that are now before you on the common issues.
The claims of liability against Owens-Corning by plaintiffs have been resolved, and Owens-Corning is now participating asin this trial as a cross-plaintiff to obtain common issue findings against certain other defendants.
It is doing this so that it may pursue claims against these defendants in subsequent trials which will be heard later by other juries. You do not need to decide, in this case, anything about Owens-Corning.
With this instruction, Judge Rombro amplified what counsel for Owens-Corning and Pittsburgh Corning explained in opening statementsthat the cross-plaintiffs were attempting to establish that additional companies were liable to the plaintiffs and thus, hopefully, to reduce the amount of their own liability. Contrary to the joint appellants' contention, the judge in no way suggested that the trial defendants were, in fact, as culpable as the cross-plaintiffs. Cf. Godwin, 340 Md. at 413-14, 667 A.2d 116 (trial court properly advised jury that certain defendants had settled with plaintiffs during trial, and court's instructions to jury to disregard comments by plaintiffs' counsel tending to "paint *960 those defendants who remain[ed] in this trial unfairly as the bad guys who have refused to settle" were sufficient to dispel any potential prejudice).
The joint appellants complain that the phasing of the trial was further complicated by Judge Rombro's policy of permitting the cross-plaintiffs to examine witnesses in Phase I about claims to be decided in Phase II, and even about claims in which the cross-plaintiffs had no interest. A review of the record makes clear that the examinations conducted by counsel for the cross-plaintiffs were aimed at adducing evidence in favor of the cross-plaintiffs cases, although the evidence may coincidentally have revealed evidence unfavorable to other defendants.[19] As the joint appellants acknowledge, Judge Rombro permitted the examination of witnesses in Phase I about matters to be decided in Phase II in order to avoid the repetition of evidence and the need to recall the same witnesses several times during the course of trial. In accordance with Md. Rule 5-611(a)(2), "[t]he court shall exercise control over the mode and order of interrogating witnesses and presenting evidence so as to ... avoid needless consumption of time...." There is no reason to believe that the judge's decision to permit the presentation of some Phase II evidence in Phase I resulted in the jury being overwhelmed.
In light of Godwin, 340 Md. 334, 667 A.2d 116, the joint appellants concede that consolidation is a necessary and proper method of managing the asbestos-related claims that are flooding the State's court system. Yet the appellants oppose the consolidation of evidence within a phase of a single case. As we have observed, the trial began in June of 1994 and did not end until February of 1995. The presentation of evidence in Phase I alone took more than five months. Had it been necessary to recall witnesses for phase II rather than allow examination of them during Phase I, the trial would no doubt have lasted considerably longer.

3. Selection of Trial Plaintiffs
The joint appellants contend that they were excluded from "meaningful participation" in the selection of the trial plaintiffs. They posit that this exclusion amounted to prejudicial error, in that the five trial plaintiffs were not representative of the estimated 1,300 common issue plaintiffs. In particular, the joint appellants argue that the five trial plaintiffs suffered from dissimilar diseases. Two trial plaintiffs suffered from mesothelioma, although cases involving that disease had been severed from the Abate II consolidation. The joint appellants also complain that the trial plaintiffs alleged exposure to asbestos in different ways, in that they worked at different jobs in different locations during different time periods.
The underlying premise of the joint appellants' argument is that the trial plaintiffs should have been representative of the common issue plaintiffs, and that the defendants should have been allowed a say in who was representative. Directing us to 340 Md. at 402, 667 A.2d 116, the appellants intimate that the Court of Appeals stated as much in Godwin. In fact, the Court did not do so. The Godwin Court merely explained that, in Abate I, "[t]he purpose of trying [the] six illustrative claims in full was to give the jury a better understanding of the issues involved in an asbestos case." 340 Md. at 343, 667 A.2d 116. We note, moreover, that the defendants themselves took the position below that the trial plaintiffs should not be considered representative of the common issue plaintiffs.
We are satisfied that the cases of the Abate II trial plaintiffs served the purpose set forth in Godwin. The evidence established that Ciotta, the least ill of the trial plaintiffs, suffered from a lung condition known as pleural plaques, which is characterized by a thickening of the lining of the lungs. Plaintiff Theis suffered from asbestosis and pleural disease, while plaintiff Glensky suffered from asbestosis and a benign *961 lung tumor, which was removed. Goodman and Morrow suffered from mesothelioma, a fast-growing cancer of the lining of the lungs.[20] Thus, the trial plaintiffs did reflect the range of asbestos-related diseases.
Contrary to the joint appellants' contentions, moreover, the trial plaintiffs alleged that they were exposed to asbestos in similar ways. The trial plaintiffs worked in similar occupations at only a handful of locations relevant to the trial. Goodman worked as an insulator's helper at the Standard Oil plant in Baltimore from 1951 to 1957. His job entailed insulating pipes and boilers with asbestos-containing products. Ciotta also worked at Standard Oil, as a pipefitter's helper from 1950 to 1956. He installed and replaced pipes, often tearing off the insulation in the process. Morrow worked as a pipefitter at the Western Electric plant in Baltimore from 1941 to 1962. He continued working at Western Electric until 1980 as an inspector. Both Goodman and Morrow alleged that, in addition to being exposed to asbestos in their own lines of work, they were exposed to asbestos-containing products used by outside contractors at their workplaces. Theis and Glensky's father, Robert Glensky, were steamfitters for Lloyd E. Mitchell, Inc. (hereinafter "Mitchell"), a local company that sent its workers to various locations.[21] Theis alleged that he and Robert Glensky were exposed to defective products used by Mitchell, and that they were also exposed to defective products being used by other contractors during construction at Murphy Homes and City Hospitals. Glensky alleged that he was exposed to asbestos when, as a child, he shook the dust off his father's clothes every evening. Also relevant to this appeal, Glensky alleged that he was personally exposed to Crane products at several locations when he himself became an apprentice steamfitter and, later, a steamfitter.
While the cases of the five trial plaintiffs were not identical, they were not so different as to cause undue confusion. As in Abate I, the trial plaintiffs' cases "g[a]ve the jury a better understanding of the issues involved in an asbestos case."

B. Verdict Sheets
Each common issue verdict sheet submitted to the jury contained the name of a defendant, along with a list of product types for which that defendant could be found liable.[22] As to Rapid, the common issue verdict *962 sheets for negligence and strict liability that were submitted to the jury listed asbestos fiber[23], asbestos-containing pipecovering, asbestos-containing block, and asbestos containing cement. The jury found Rapid to have been negligent as to all four product types and found that all four product types manufactured by Rapid were defective. The verdict sheets for Crane listed asbestos-containing gaskets and asbestos-containing packing. The jury found Crane to have been negligent as to packing and found that Crane's packing was defective. It found no liability on Crane's part as to its gaskets. The verdict sheets for U.S. Mineral listed asbestos-containing spray, and the jury found U.S. Mineral to have been negligent. The jury further found that U.S. Mineral's spray was defective. The jury found Stebbing to have been negligent as to the asbestos-containing sprays and asbestos-containing joint compounds it used, and also found that both product types used by Stebbing were defective. The verdict sheet for Hampshire listed asbestos-containing spray and asbestos-containing joint compounds. The jury found Hampshire negligent as to both product types and further found that the product types used by Hampshire were defective. The verdict sheets for other defendants that are not parties to this appeal contained a total of 24 other product types.[24]
The joint appellants contend that, because the verdict sheets listed product types rather than specific products by their brand names, the verdict sheets were fatally defective. The appellants posit that the use of product types rather than brand names was "tantamount to a confession" by Judge Rombro that the trial had become "so bloated and prolix that ... it was not feasible for the jury to determine whether any individual product was defective." They assert that the verdict sheets prevented the jury from distinguishingon the bases of the amounts of asbestos *963 fiber the products contained and were capable of emitting or on warnings that were in place at any particular timebetween products of a particular type that might have been defective and products that were not defective. The appellants add that, in a strict liability action, specific identification of a particular product is an essential ingredient of the plaintiff's proof.
Judge Rombro decided upon the form of the common issue verdict sheets after considerable debate by counsel. In rejecting arguments that the verdict sheets should list specific brand names rather than product types, the judge stated:
Everybody has argued that. I am satisfied and I have really thought about it and I want you to know I did discuss this and I did talk to Judge Levin about it.
And I looked at some of the old verdict sheets [from Abate I ]. Some of them had the specific product, some of them are generic. I am satisfied, on the state of the evidence in this case, that the generic is sufficient to go to the jury. And I am going to let it go that way.
(Emphasis added.)
Rule 2-522(c) provides, in pertinent part:
The court may require a jury to return a special verdict in the form of written findings upon specific issues. For that purpose, the court may use any method of submitting the issues and requiring written findings as it deems appropriate, including the submission of written questions susceptible of brief answers or of written forms of the several special findings that might properly be made under the pleadings and evidence....
In Owens-Corning Fiberglas Corp. v. Garrett, 343 Md. 500, 525, 682 A.2d 1143 (1996), the Court of Appeals explained: "Rule 2-522 gives the trial court the authority to design submissions to the jury as well as format the jury's findings. Maryland appellate courts have observed before that special verdicts are often useful in cases with multiple parties or issues." A trial court's use of a particular form for special verdicts will not be reversed absent an abuse of discretion. See generally Sun Cab Co., Inc. v. Walston, 15 Md.App. 113, 161, 289 A.2d 804 (1972), aff'd, 267 Md. 559, 298 A.2d 391 (1973).
The "state of the evidence" in the record does indeed support Judge Rombro's decision to submit verdict sheets listing product types rather than specific brand names. Goodman, Ciotta, Morrow, and Theis testified that, when working with or near the asbestos-containing products of the defendants against whom they had claims, they saw visible dust from the products.[25] John McCray Dement, Ph.D., who testified for the plaintiffs as an expert in the fields of industrial hygiene, epidemiology, and the history of knowledge of the hazards of asbestos, testified that "the presence of visible dust indicates an excessive exposure." Dr. Dement elaborated:
A ... [A] visible dust indicates, as I have testified before, concentration minimally in the range of 15 to 20 million particles per cubic foot of air, and that presents an excessive dust concentration with regard to health and there is a health risk.
Q [By plaintiffs' counsel] Would your opinions hold true for any product which contains asbestos and which creates visible dust when it is manipulated?

...
A My opinion is that, of course. Asbestos, and it is with regard to products that contain asbestos and the presence of that dustof the asbestos and the dust generated from the product, if there is visible dust, as a hygienist, we use that as an indication of exposures in the ranges that I have indicated.
And for asbestos, that presents a concentration that is a very significant health hazard.
Although the joint appellants complain that the form of the verdict sheets prevented the *964 jury from considering "meaningful differences among individual products, such as substantially different amounts of asbestos, and different potentials for fiber release due to distinct forms, uses, and temperatures," they do not direct us to any evidence in the record that would suggest that visible dust from a particular product does not necessarily imply a dangerous level of asbestos.
The appellants complain that Rapid was found liable for "asbestos-containing cement" in general, but that the evidence established that Rapid produced one brand of cement that contained 60-percent to 70-percent asbestos, one brand that contained ten-percent asbestos, and one brand in which the asbestos was fully encapsulated. They complain that Crane was found liable for "asbestos-containing packing," but the evidence indicated that Crane made "hundreds of distinct products produced through different manufacturing techniques, different compositions, different means of encapsulation, and intended for different applications and usages."[26] The joint appellants do not suggest, however, that there was any evidence that exposure to dust from an asbestos-containing product that contained a lower percentage of asbestos than others would not be "excessive." Nor do they suggest that there was evidence that warnings were in place as to some brands but not others. Moreover, the appellants ignore that, in order to establish liability, the trial plaintiffs had to prove actual exposure to dust, as well as damages therefrom. Plaintiffs at subsequent mini-trials will have to do the same.
While a product containing fully encapsulated asbestos will not ordinarily produce dust and, therefore, will not ordinarily cause harm, there is no dispute that such a product can be alteredby sawing, cutting, or grinding, for exampleand that asbestos fibers in the form of dust can then be released. See generally Anchor Packing Co. v. Grimshaw, 115 Md.App. 134, 190, 692 A.2d 5, cert. granted sub nom. Porter Hayden v. Bullinger, 346 Md. 373, 697 A.2d 112 (1997). In order to prevail in a claim involving an encapsulated product, future mini-trial plaintiffs will have to prove sufficient exposure to such dust.[27]
The joint appellants' contention that they could not properly be held strictly liable for a product unless the product was specifically listed by its brand name on the verdict sheet is without merit. The form of the verdict sheets made clear that the jury was to determine whether the particular defendant listed could be strictly liable for all of the products of a particular type that it manufactured, sold, distributed, or installed. As we have explained, the apparently uncontroverted evidence was that exposure to visible dust from any asbestos-containing product was excessive.[28] *965 In their reply brief, the joint appellants argue, in the alternative, that
because the verdict forms did not find individual products to be defective (or even identify the products claimed to be within a particular category), any mini-trial plaintiff who claims exposure to a particular product will have to prove liability for that product. In addition to the obvious waste of judicial resources, the re-examination of issues by a second jury infringes the defendants' [Seventh Amendment] rights under the United States Constitution to have factual issues determined by a single jury.
As the appellants implicitly recognize in the first prong of their argument, the verdict sheets demonstrate that the jury determined, as to each defendant, whether the defendant was negligent in manufacturing, selling, distributing, or installing each product of a particular type, and whether the product that the defendant manufactured, sold, distributed, or installed was defective. If the jury answered in the affirmative, it further determined issues regarding liability as to those defendants named by the trial plaintiffs. That is, the jury then determined whether the trial plaintiffs were exposed to the products in question, and whether they were damaged by that exposure. The cases of the common issue plaintiffs are to proceed to mini-trials, where new juries are to determine the issues regarding liability. The new juries will not be called upon to determine whether the defendants were negligent or whether any specific products were defectivethose matters were determined by the Abate II jury.

C. Erroneous Verdicts
The joint appellants contend that "[m]any of the jury's verdicts in Abate II are contrary to the trial record...." The appellants conclude that the alleged erroneous verdicts reflect "jury confusion and prejudice caused by the consolidation." They urge that all of the judgments and verdicts be vacated.
Specifically, the joint appellants allege the following:
- the jury found Westinghouse Electric Corp. (hereinafter "Westinghouse") liable for fire retardant asbestos-containing decorative micarta from 1940 to the present, but Westinghouse presented uncontroverted evidence that it did not begin using that product until 1957.
- the jury found Stebbing liable for asbestos-containing spray from 1947 to the present, but Stebbing presented uncontroverted evidence that it did not begin using spray until 1954.
- the jury found Mitchell liable for asbestos-containing spray from 1939 to the present, but Mitchell presented uncontroverted evidence that it did not use spray until 1949.
- the jury found Hampshire liable for asbestos-containing spray and joint compound from 1939 to the present, but there was no evidence that Hampshire used the spray before 1955 or the joint compound before 1961.
- the jury found Asbestospray to have successor liability for Spraycraft fireproofing spray from 1939 to 1967, but there was uncontroverted evidence that the spray was not on the market until 1953.
- the jury found Rapid to have successor liability for Philip Carey Manufacturing Company products from 1939 to the present, even though Judge Rombro instructed the jury that it "need not consider Rapid-American's liability for the Philip Carey Manufacturing Company or the Philip Carey Corporation, new Carey, for any actions after June 1, `67."
- the jury found Crane liable for asbestos-containing packing but not gaskets, and also found Crane liable to Theis and Glensky, but the only evidence presented as to Theis and Glensky indicated that they were exposed to Crane gaskets but not Crane packing.
- the jury found Harbison-Walker liable for punitive damages for a variety of products from 1940 to the present, but Harbison-Walker presented uncontroverted evidence that it did not manufacture or sell any asbestos-containing products until *966 sometime in the 1950s, and the jury did not find Harbison-Walker negligent or strictly liable as to any product until 1953. In addition, in post-trial motions, a combination of plaintiffs and cross-plaintiffs requested revisions to a total of 80-percent of the common issue verdicts against Harbison-Walker.
Preliminarily, we point out that Mitchell has not joined in this appeal. Neither Westinghouse nor Asbestospray are parties to this appeal, as no final judgments were returned against them at trial. Although judgments were returned against Harbison-Walker in favor of trial plaintiffs Goodman and Ciotta, Judge Rombro granted Harbison-Walker's motions for judgment notwithstanding the verdict in those cases. The arguments regarding those defendants, therefore, are before this Court only to the extent that they may, as the joint appellants contend, signal some impropriety in the consolidation. The arguments regarding the common issue verdicts against Stebbing and Hampshire are properly before this Court for that same reason. Judgments were returned against Stebbing and Hampshire in favor of certain trial plaintiffs, moreover. The dates of liability found by the jury clearly bear on the judgments in favor of the trial plaintiffs thus, the appeals by Stebbing and Hampshire as to the dates of liability are now ripe.[29]

- Dates of Liability -

- Starting Dates -
The bulk of the alleged errors concern the starting dates of liability set forth on several of the common issue verdict sheets. Contrary to the assertions of the joint appellants, the alleged errors do not reflect confusion on the part of the jury. The plaintiffs presented evidence that, by 1939, the dangers of asbestos exposure were widely known in the industry. They informed the jury, in fact, that in 1939 the Legislature made asbestosis an occupational disease under the Maryland Workers' Compensation statute. See 1939 Laws of Maryland chapter 465, § 32A at 991-92; Md. Ann.Code art. 101, § 34 (1939). On the verdict sheets in question, the jury chose 1939 as the date that liability began for those defendants that were in business at that time,[30] with the exception of Westinghouse; for those defendants who were not yet in business, it chose the date that they began operating. The jury thus made clear that it found the defendants liable for any products of the types listed that were manufactured in 1939 or later. As to Westinghouse, the jury apparently accepted the argument of plaintiffs' counsel that Westinghouse became aware of the dangers of asbestos sometime around 1940. The jury chose 1940 as the starting date of liability for all of the Westinghouse products involved.
On other common issue verdict sheets, the jury did set forth dates of liability based on when the defendants began manufacturing, selling, distributing, or installing asbestos-containing products. While we cannot explain the jury's deviation from this practice in regard to the verdict sheets in question, we do not agree with the joint appellants that the explanation is jury confusion. It may well be, as the plaintiffs suggest, that the jury simply rejected the defendants' evidence as to when they began manufacturing or using particular products.
While we do not agree with the joint appellants' assertions that the jury's selection of the dates in question signified confusion, we do agree that the jury should have accepted the uncontroverted evidence presented by the defendants. Of the several erroneous starting dates alleged by the appellants, however, only the errors as to Stebbing and *967 Hampshire are ripe for appeal. Final judgments have not yet been reached in the cases of the other defendants mentioned.
Stebbing and Hampshire moved below, inter alia, to have the common issue verdicts altered or amended to reflect more precise starting dates of liability. In light of the uncontroverted evidence as to the starting dates, the trial court erred in denying the motions. We therefore vacate the common issue verdicts as to Stebbing and Hampshire insofar as the starting dates of liability are concerned. We remand the case to the trial court with instructions to reform the starting dates to conform to the evidence.[31]
Although we take this precautionary measure, we emphasize that it is highly improbable that a mini-trial plaintiff will attempt to provelet alone succeed in provingexposure to a defendant's product at a time before the defendant manufactured or used the product. Of course, in the unlikely event that the joint appellants' predictions come true and such a thing does transpire as to another defendant whose appeal is not now before us, that defendant may appeal from the resulting judgment.

- Ending Dates -
In a similar vein, we determine that the fact that the jury found Rapid to have successor liability for Philip Carey Manufacturing Company products from 1939 to the present, rather than until 1967, does not indicate confusion. Judge Rombro informed the jury that there were successor liability claims against Rapid and Asbestospray. He later instructed the jury that the claims against Rapid involved the Philip Carey Manufacturing Company, which became Philip Carey Corporation in 1967. The judge explained:
I have made a legal decision that you need not consider Rapid-American's liability for the Philip Carey Manufacturing Company ["old Carey"] or the Philip Carey Corporation, new Carey, for any actions after June 1, 1967.
Therefore, I am withdrawing for your consideration ... the verdict sheets pertaining to new Carey. They will come out of the package that will be given to you, so you won't even have those when you go to deliberate.
I also instruct you to disregard all of the evidence you have heard and all arguments concerning new Carey. New Carey asbestos-containing products are not at issue in this trial.
Now, I have also ruled, as a matter of law, that Rapid-American is liable as a successor to Philip Carey Manufacturing Company, which is old Carey, for its products and actions up through June 1, `67.
Previously, in the context of explaining the duty to warn of product defects, Judge Rombro had instructed the jury as follows:
Now, there is also what is called a continuing duty to warn. A manufacturer of the defective product generally has the duty to warn of product defects which the manufacturer discovers after the time of sale.
A manufacturer is obliged to reasonably communicate an effective warning even after a sale of a product based on later acquired knowledge of the danger as soon as it is reasonably foreseeable.
This post-sale duty to warn requires reasonable efforts to inform users of the danger once the manufacturer is or should be aware of the need for a warning.
The warning is required to the extent practicable under the circumstances.
*968 The judge did not modify his instruction on the duty to warn when he instructed the jury about old and new Carey.
Rapid's counsel argued to the jury, and the joint appellants now contend, that the judge's instruction prohibited the jury from finding that Rapid had successor liability for Philip Carey Manufacturing Company beyond June 1, 1967. As its verdict makes clear, the jury disagreed. In light of Judge Rombro's instruction as to the continuing duty to warn, that disagreement was quite logical. It is apparent that the judge meant merely to inform the jury that it could not hold Rapid liable for the actions of new Carey. We acknowledge that the instruction could have been more carefully worded. We do not agree, however, that it can be read to foreclose a finding that old Carey or its successor, Rapid, had a continuing duty to warn after 1967.

- Crane's Packing and Gaskets -
The jury found Crane liable, on the common issues, for asbestos-containing packing but not for asbestos-containing gaskets. In other words, the jury concluded that Crane packing was defective, but Crane gaskets were not. It also found Crane liable to trial plaintiffs Theis and Glensky. The joint appellants posit that the evidence presented at trial established that Theis and Glensky, on his own and through his father, were exposed to Crane gaskets but not packing. They conclude that the jury's findings were, therefore, contradictory.
The appellants direct us to the testimony of Theis, who worked with Glensky's father. Theis stated that his job entailed working with Crane gaskets and other asbestos-containing materials. He did not mention ever working with Crane packing. Theis explained that "some gaskets came precut, some gaskets came in a sheet.... The ones that were not precut, we had to actually cut those gaskets." He recalled that the gaskets created dust when he worked with them. The joint appellants, and Crane in its individual brief, further direct us to testimony from Theis, Morrow, and another witness, Robert Buckley, who had worked with asbestos-containing products, to the effect that packing and gaskets are different products with different purposes. Crane points out that Dr. Robert N. Sawyer, an expert witness called by a defendant who is not a party to this appeal, testified that "gaskets are gaskets and packings are packings."
The appellants do not direct this Court to the one piece of evidence that makes clear that there is no contradiction at all. A Crane catalog that was admitted into evidence at trial lists several pages of asbestos sheet packing. In the description of each style of sheet packing, it is noted that gaskets can be cut from the packing. The catalog contains no listings for "sheets" of gasket materials. Thus, the evidence presented at trial made clear that the gaskets that Theis described as coming "in a sheet" actually came in a sheet of asbestos-containing packing. While Theis, Morrow, Buckley, and Sawyer explained that gaskets and packing are not the same thing, they in no way implied that gaskets cannot be cut from sheet packing. It is apparent that the jury concluded that Theis and Glensky were exposed to asbestos dust emitted from sheet packing when it was cut into gasket form.

- Harbison-Walkers's Judgment Notwithstanding the Verdict -
The jury found Harbison-Walker liable for six asbestos-containing productsrefractory gunning mix, castable, cement, refractory brick with spacers, rollboard, and blockas well as for punitive damages. The joint appellants contend that, in post-trial motions, a combination of plaintiffs and cross-plaintiffs "acknowledged that 80% of the jury's special verdict answers for [Harbison-Walker] were incorrect and not supported by the evidence." [32] The joint appellants misrepresent the positions of their opponents.
In a motion to revise the jury's findings as to Harbison-Walker, the plaintiffs asserted that the jury inadvertently transposed the *969 dates of liability for asbestos-containing cement and asbestos-containing gunning mix. The plaintiffs also pointed out that the jury set forth dates of liability for various products, and that each date was the date Harbison-Walker began manufacturing, selling, distributing, or installing the particular product. Although the first date of liability was 1953, the jury chose 1940apparently the year Harbison-Walker was incorporatedas the starting date for potential punitive damages liability. The plaintiffs suggested that the 1940 date be reformed. In a separate motion to revise findings as to Harbison-Walker, which was combined with a response to Harbison-Walker's motion for judgment notwithstanding the verdict, cross-plaintiff Pittsburgh-Corning asserted that the starting dates for Harbison-Walker's liability for asbestos-containing gunning mix and asbestos-containing block should be 1955 and not 1953. Pittsburgh-Corning also suggested that liability for asbestos-containing rollboard should begin in 1960 rather than 1962. In short, a review of the record makes clear that the plaintiffs and cross-plaintiffs acknowledged that minor clerical errors may have been made on the verdict sheetsnot that "80% of the jury's special verdict answers for [Harbison-Walker] were incorrect and not supported by the evidence."
As we have observed, the trial court granted Harbison-Walker's motion for judgment notwithstanding the verdict as to all punitive damages, and explained that the plaintiffs had failed to present sufficient evidence to establish that Harbison-Walker "was guilty of the conduct required to sustain a punitive damage award." The court also granted Harbison-Walker's motion for judgment notwithstanding the verdict as to the negligence and strict liability judgments in favor of Goodman and Ciotta. Although the parties do not elaborate on the matter, it appears that Goodman and Ciotta alleged exposure to Harbison-Walker's asbestos-containing cement in the 1950s, but the jury found that the company's liability for the cement began in 1964. This, of course, indicates erroneous findings by the jury.

- Insufficient Evidence of Exposure -
Although the appellants do not raise the matter in their joint brief, we are compelled to point out that the verdicts in favor of various trial plaintiffs against U.S. Mineral, Stebbing, and Hampshire were not supported by the evidence. Each of these verdicts shall be discussed infra in some detail. While we determine that the jury inferred exposure to products when such inferences could not properly be drawn, we do not suggest that this indicates that the jury was confused or overwhelmed.
In most circumstances, there was evidence that the particular appellant's product was used at the particular trial plaintiff's place of employment, but not at a time when or a place where the trial plaintiff could have been exposed to it. In closing argument, however, plaintiffs' counsel contended that asbestos "fibers remain in the air, which exposes pretty much an entire workplace based upon how the wind is blowing and who is around." Counsel added that the fibers "become[ ] airborne again" during clean-up operations. The jury may well have accepted this argument, which set forth the so-called "fiber drift theory." The Court of Appeals has rejected the fiber drift theory, however, on the ground that it is inconsistent with Maryland requirements of causation. See Balbos, 326 Md. at 216-17, 604 A.2d 445.
Of all of the allegations of jury error, only the Harbison-Walker verdict sheets as to punitive damages and liability to Goodman and Ciotta clearly demonstrate significant findings that did not comport with the evidence presented at trial and could not be logically explained.[33] The errors were corrected by the trial court. The situation is analogous to that with which the Court of Appeals was faced in Godwin, 340 Md. 334, 667 A.2d 116. There, the Abate I jury assigned an erroneous starting date for the negligence of one defendant. Upon the defendant's *970 motion, Judge Levin reformed the verdict. On appeal, the Court of Appeals rejected an argument that the error reflected confusion on the part of the jury. The Court held that Judge Levin's correction of the "obvious error" was sufficient, and commented: "Measured against the scope of the task confronting it, that mistake by the jury is de minimis." Id. at 403, 667 A.2d 116. We are satisfied that the mistakes in the instant case were de minimis as well, and that the remedy provided when Judge Rombro granted Harbison-Walker's motion for judgment notwithstanding the verdict was sufficient.

II

FAIR AND IMPARTIAL JURY
The joint appellants further argue that, even if the consolidation was proper, they were denied their rights to a fair and impartial jury.

A. Dismissals for Hardship
The pool of prospective jurors initially consisted of 200 people. At the start of the jury selection process, Judge Rombro asked if any of the prospective jurors planned to request a hardship deferment. One hundred and thirteen persons responded in the affirmative. Judge Rombro then directed that the 113 prospective jurors be given hardship deferment forms to fill out.
Judge Rombro apprised counsel of his intention to dismiss those prospective jurors claiming hardship, pending possible recall if voir dire of the remaining prospective jurors established that there would not be a sufficient jury pool to select a panel. The judge stated that, even without those prospective jurors: "We are going to have 85, give or take one or two, but we have got 85 who are not asking for deferments. I think that is enough [to select a jury panel]." The judge added:
[L]ook, I am going to tell you right now and I will say it on the record, in a trial of this length, if somebody says to me I can't do it because I have such and such a problem, it is going to be a very unusual case that I am not going to excuse them.
The attorneys for the various defendants objected that the procedure would "pretty much excuse[ ] all of the professionals" from the jury pool, but Judge Rombro adhered to his plan.
The remaining jurors were asked to fill out questionnaires and, over the next several days, voir dire was conducted. Judge Rombro reviewed the hardship deferments as well. At the close of voir dire, Judge Rombro informed counsel: "I said that we had [about] 90 people to work with and we were going to work with them to see if we could get a sufficient pool, and we have, so I don't know that I really even have to address the question of hardships." Defense counsel reiterated their objections that the dismissal of the jurors would alter the jury pool by depleting it of professionals. They urged Judge Rombro to question each prospective juror who claimed a hardship. The judge responded:
I reviewed every hardship. I didn't just take a shortcut. I read every one of them and on the face of them I made certain decisions with regard to those folks.
Would the decision have been different with regard to one or two or three, maybe even five of them if they had come in and taken the stand and I made each one tell me about the hardship? It is possible.
The joint appellants now contend that by dismissing all of those persons who claimed hardship, Judge Rombro excluded an entire classthe class of "professionals"of prospective jurors. They point out that, under Md. Cts. & Jud. Proc.Code Ann. § 8-102(a) (1995 Repl.Vol.), "[w]hen a litigant in a court of the State is entitled to trial by a petit jury..., the jury shall be selected at random from a fair cross-section of the citizens of the State who reside in the county where the court convenes." Under § 8-103, "[a] citizen may not be excluded from service as a grand or petit juror in the courts of the State on account of race, color, religion, sex, national origin, or economic status." The joint appellants remind us that "[t]he American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury *971 drawn from a cross-section of the community." Thiel v. S. Pac. Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). The joint appellants do not challenge the original array of prospective jurors. Instead, they contend that once the hardship deferments were granted the array no longer represented a cross-section of the community, in that professionals were eliminated from the array.
To the extent that the joint appellants' argument may be considered an appeal from an unsuccessful challenge to the array, the appellants have failed to meet their burden of establishing that the array, as altered, was not a cross-section of the community. See generally Md. Rule 2-512(a). The appellants have not provided this Court with their definition of "professional." Nor have they directed us to anything in the record that would indicate how many professionals were in the original array or how many professionals were dismissed for hardship reasons. They have merely reiterated the argument made below, that Judge Rombro's action "pretty much excuse[d] all of the professionals." The appellees inform us that, even after the hardship dismissals, the jury pool included a retired Air Force surgical nurse, a registered nurse employed at a veterans medical center, a teacher with a Ph.D. who worked at Coppin State University, a pollution control analyst for the City of Baltimore, and an electrical engineer with the Department of Defense.[34]
To the extent that the argument may be considered an appeal from the court's dismissal of the prospective jurors without conducting further inquiry into the hardship claims, the argument is without merit. Judge Rombro informed counsel that he had reviewed each of the deferment forms and concluded that each was meritorious, although he admitted that it was "possible" that a handful would not withstand scrutiny if the jurors were called in for further questioning. As the judge pointed out to defense counsel: "Nobody, nobody has said to me that there is any law, that there is any case that says I must review every hardship [by interrogating the prospective juror individually]."
The Court of Appeals has made clear, moreover, that a prospective juror's request for a hardship deferment is between the juror and the court and is of no legitimate concern to the parties in the case. See Porter v. State, 289 Md. 349, 424 A.2d 371 (1981) (defendant's right to be present at all stages of trial does not extend to court's questioning of prospective jurors as to hardship claims). The question of whether a prospective juror should be excused for personal hardship
does not implicate the interests of the defendant. Instead, the interests to be balanced are those of the prospective juror and the administration of the court system. The trial judge must weigh the degree of hardship or inconvenience, as well as any other circumstances relating to the prospective juror's personal reasons for wanting to be excused, against the effect upon the administration of the court and the statutory obligation of every registered voter to serve when summoned as a juror. Whether or not the defendant desires to have the individual serve is irrelevant to the question of excusing the prospective juror for personal hardship.
Id. at 356, 424 A.2d 371.

B. Racial Discrimination
After the hardship dismissals were granted, six white personsthree women and three menremained in the jury pool. After the jury was selected, but before it was sworn, counsel for the various defendants pointed out that the plaintiffs had used five of their six peremptory challenges to strike all three of the white women and two of the white men.[35] Defense counsel complained that the plaintiffs had used their strikes in a discriminatory fashion in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 *972 L.Ed.2d 69 (1986). See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 628-31, 111 S.Ct. 2077, 2087-89, 114 L.Ed.2d 660 (1991) (extending Batson to civil trials); Gilchrist v. State, 340 Md. 606, 624, 667 A.2d 876 (1995) (The Batson rule "applies equally to white persons and black persons").
In Gilchrist, 340 Md. at 625-26, 667 A.2d 876, the Court of Appeals explained:
The Supreme Court in Batson articulated a three-step process to be utilized by trial courts in assessing claims that peremptory challenges were being exercised in an impermissibly discriminatory manner....
First, the complaining party has the burden of making a prima facie showing that the other party has exercised its peremptory challenges on an impermissibly discriminatory basis, such as race or gender.... Moreover, "[w]hether the requisite prima facie showing has been made is the trial judge's call...."
Second, once the trial court has determined that the party complaining about the use of the peremptory challenges to rebut the prima facie case, the burden shifts to the party exercising the peremptory challenges to rebut the prima facie case by offering race-neutral explanations for challenging the excluded jurors. The "explanation must be neutral, related to the case to be tried, clear and reasonably specific, and legitimate." ... The reason offered need not rise to the level of a challenge for cause.... "At this step of the inquiry, the issue is the facial validity of the ... explanation." ... It is insufficient, however, for the party making the peremptory challenges to "merely deny[ ] that he had a discriminatory motive or ... merely affirm[ ] his good faith." ...
Finally, the trial court must "determine[ ] whether the opponent of the strike has carried his burden of proving purposeful discrimination." ... This includes allowing the complaining party an opportunity to demonstrate that the reasons given for the peremptory challenges are pretextual or have a discriminatory impact.... It is at this stage "that the persuasiveness of the justification becomes relevant....... At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."...
(Citations omitted.)
At the trial below, Judge Rombro determined that the defendants had made a prima facie showing of discrimination. He then called upon counsel for the plaintiffs to offer race-neutral explanations for the peremptory strikes. Counsel explained that:
- juror number 118, a white woman, was struck because she: indicated that she knew a witness for the defense; "was a consultant and had a professional background;" and "recognized one of the defense firms in the case...."
- juror number 119, a white woman, was struck because she was a carpet representative who had had prior business dealings with two of the defendants.
- juror number 245, a white man, was struck because he: had a "management background;" had two friends with asbestosis; and had "[k]nowledge of Piper and Marbury...."
- juror number 306, a white woman, was struck because she: held a management level position with the Department of Defense; had a family member or friend who died of lung cancer; and commented that she believed that lung cancer was caused by cigarette smoking.
Plaintiffs' counsel was not called upon to offer an explanation for striking juror number 304, a white man. Counsel for the defendants explained: "We did not challenge 304. We agree he should have been struck."
In sum, the plaintiffs explained that they used their peremptory strikes to eliminate persons who they believed might be sympathetic to the defense, such as persons in management positions, persons familiar with defense witnesses or counsel for the defense, and persons with preconceived ideas about lung disease. Judge Rombro expressed some skepticism as to whether juror number 245, who described himself as a "supervisor," actually held a management position. The judge ultimately ruled:

*973 Now, the jury is seated, the six individuals are all African Americans, and there are ten alternates, and of that group only one is white.
I am satisfied after listening to counsel that that did not occur by design. There were reasons given as to the strikes that they made.
Some of them I thought were thin and I don't mind telling you, but they were reasons that, I guess, under these circumstances, and considering that all of the trial plaintiffs, illustrative plaintiffs or whatever you want to call them are white, and I don't find that there has been any violation of the civil [Batson ] rule.
In Purkett v. Elem, 514 U.S. 765, 767-69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995), the Supreme Court elaborated on the second step of the Batson inquiry, whereby the party exercising the peremptory challenges is called upon to offer race-neutral explanations for the challenges. The Court explained:
The second step of this process does not demand an explanation that is persuasive, or even plausible, "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reasons offered will be deemed race neutral."
514 U.S. at 768, 115 S.Ct. at 1771 (citation omitted; brackets supplied by Purkett Court). In light of Purkett, this Court has explained:
In a practical sense, if, after the party opposing the strike has presented a prima facie showing, the proponent thereof proffers a facially neutral reason that is accepted by the trial court, then an appeal on Batson principles has little, if any, chance of success, given that the credibility of the proponent offering the reasons is, as it is generally, for the trial courtnot an appellate courtto determine.
Ball v. Martin, 108 Md.App. 435, 456, 672 A.2d 143 (1996).
Judge Rombro clearly expressed his determination that counsel for the plaintiffs had non-discriminatory reasons for exercising their peremptory challenges. The judge pointed out that, like the struck jurors, all five trial plaintiffs were white. He recalled that plaintiffs' counsel had offered race-neutral reasons for all of the challenged strikes. A facially neutral reason that is accepted by the trial court is all that is required to overcome a Batson challenge. The justifications offered by plaintiffs' counsel were neither "implausible" nor "fantastic" Gilchrist, 340 Md. at 626, 667 A.2d 876. Giving due deference, as we must, to Judge Rombro's assessment of the credibility of plaintiffs' counsel in offering the explanations, we perceive no violation. See Ball, 108 Md.App. at 456, 672 A.2d 143.

C. Ex Parte Communication
Several months before trial began, plaintiffs' counsel proposed that the jurors be provided with notebooks in which they could organize their trial notes. Plaintiffs' counsel further proposed that photographs of the expert witnesses be inserted into the notebooks. At that time, Judge Rombro indicated:
I certainly ... do intend that the jury will have notebooks, whatever they need to take notes over the course of the trial.
What should be put in there is a matter that we will discuss. Photographs are an interesting concept.
On the day trial began, counsel for the plaintiffs presented the court with three-ring binders for the jurors. Judge Rombro stated that the notebooks would be distributed to the jurors after counsel for the defendants had a chance to look at the notebooks and to lodge any objections they might have. The notebooks were made available to defense counsel, and no objections were made. The notebooks, apparently, were then distributed. No further discussion was had regarding the proposed photographs.
Two months into trial, counsel for one defendant reported to the court that he had seen a juror putting a photograph of an expert witness for the plaintiffs into a notebook. Speaking for counsel for all of the plaintiffs, attorney Theodore M. Flerlage, Jr. acknowledged that, after each expert witness for the plaintiffs had testified, plaintiffs' counsel had given the court clerk a stack of *974 papers, each containing a photograph of that witness with the witness's name and a brief summary of his or her qualifications printed at the bottom of the page. The court clerk had then given the papers to the jury to be inserted into the notebooks. It was later established that, in that way, pages regarding eight expert witnesses had been distributed to the jury. Flerlage asserted that plaintiffs' counsel believed that the court had approved the plan to supply such materials to the jury, and fully expected counsel for the defendants to do the same.
Counsel for all of the defendants then moved for a mistrial, insisting that the actions of plaintiffs' counsel amounted to improper and prejudicial ex parte communications with the jury. They suggested that, before making a ruling on the motion, Judge Rombro question plaintiffs' counsel as to "exactly what they have disseminated to the Clerks for dissemination to the jury and how that was done." They added that, if the court felt it was necessary, it could also question an alternate juror and then dismiss that juror.
Judge Rombro indicated that he would be willing to question a juror in counsel's presence regarding the photographs but, apparently alluding to the request that the juror then be dismissed, added: "If those are the conditions that the defense puts on my questioning, I won't do it."
The judge did conduct further questioning of Flerlage. Flerlage provided the court with copies of several of the papers that had been given to the jury, reiterated that plaintiffs' counsel had never contacted any juror directly regarding the papers, and provided the court with citations to the trial transcript which, in his view, supported the plaintiffs' position that the distribution of the materials had been sanctioned by the court.
The judge also questioned the court clerk regarding the matter. The clerk indicated that, at the request of plaintiffs' counsel, she and another clerk had, at separate times, deposited stacks of papers on the table in the jury room. The court clerk further informed the court: "Anything that is given to the jury, we go in the jury room and put whatever it is on the table and we say this is for you to put in your notebook".[36]
Upon first learning of the papers, Judge Rombro called the actions of plaintiffs' counsel "mind boggling" and stated: "I can't believe that the plaintiffs did what they did in this case." Upon further reflection, however, the judge observed:
I have already and perhaps too strongly chastised the plaintiffs for their actions in this case.

...
I don't think that this was a deliberate act of flouting the Court's ruling or the general ethical considerations of what counsel has to follow in the trial of the case.

...
I think that it was a misunderstanding and misreading....
Judge Rombro pointed out that months before trial, when plaintiffs' counsel proposed putting photographs in the jurors' notebooks, not one counsel for the defendants voiced any opposition. Judge Rombro also pointed out that the very same practice had been approved and used in the Abate I trial.
Relying on Wernsing v. General Motors Corp., 298 Md. 406, 470 A.2d 802 (1984), Judge Rombro denied the motion for mistrial. In that personal injury case, the jury asked the bailiff for a dictionary so that it could clarify the definition of "proximate cause." The bailiff supplied the requested dictionary, and the definition found by the jury conflicted with the definition supplied by the court in its instructions. Verdicts were rendered in favor of the plaintiffs. Upon learning of the jury's use of the dictionary, the defendants moved for a new trial. The trial court denied the motion, but this Court *975 reversed, General Motors Corp. v. Wernsing, 54 Md.App. 19, 456 A.2d 939 (1983), and the Court of Appeals affirmed our decision. The Court explained that the defendants had shown a strong "probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case." 298 Md. at 420, 470 A.2d 802. It concluded that the trial court had abused its discretion in determining otherwise.
In reaching its conclusion, the Court of Appeals expressly rejected a rule adopted by some other jurisdictions that presumes prejudice solely from delivery of a dictionary into the jury room without the consent of the court and all parties. The Court explained that such a presumption could never be rebutted since jurors in Maryland may not be interrogated regarding their deliberations in order to impeach the verdict. It opined:
Further, a presumption of prejudice from the unauthorized presence of a dictionary is inconsistent with the rule we apply when, in the course of trial and before the jury retires, it is learned that a juror has received information concerning the case from a source outside of the record. In those circumstances prejudice is not presumed; rather the test is "whether the conversations were `of such a nature that their effect must fairly be held to have been to deprive the injured party of a fair and impartial trial.'"
298 Md. at 416, 470 A.2d 802.
Judge Rombro reasoned:
If the [Wernsing C]ourt says that you don't presume prejudice from the introduction of a dictionary, then seems to me, clearly follows, that I cannot presume prejudice in this case solely from introduction of a photograph, at the bottom of which is certain information which is in the CV, curriculum vitae of the witnesses who testified.
I find, not just that the parties moving for mistrial have not met the burden of proving prejudice, but I find that there is no prejudice based on this.
The judge later told counsel:
Look, I have to tell you, it shouldn't have been done, all right? We all agree on that, but it is innocuous for God's sake.
Everybody is making such a thing about this like it is handing over the atomic secrets to some foreign country.
It really is innocuous. It is a photograph and it says exactly what is on the curriculum vitae....
The judge offered to retrieve the materials from the jurors or to permit the defendants to submit like materials regarding their expert witnesses to the jury. A majority of defendants chose the former option, so the materials were retrieved. The defendants subsequently filed a motion to reconsider the denial of the mistrial request, but the motion for reconsideration was denied.
The joint appellants contend that Judge Rombro's investigation into any prejudice caused by the distribution of the photographs was insufficient. They assert that the judge should not have denied the mistrial motion without first allowing "complete examination of the plaintiffs and court clerks involved..." The appellants seemingly ignore Judge Rombro's extensive interrogation of Flerlage, and the judge's questioning of one of the two court clerks involved. Flerlage insisted that plaintiff's counsel believed they had the court's approval to submit the photographs to the jury. He made clear that no counsel had ever given photographs to a juror directly. The court clerk told the judge that whenever any item was delivered to the jury, it was the practice of the court clerks in general to deposit the item on the desk in the jury room with the simple explanation: "[T]his is for you to put in your notebook." Judge Rombro accepted these assertions. The judge examined several of the pages in question, moreover. He determined that each contained nothing more than a photograph of the witness and a brief summary of his or her curriculum vitaeall information that had already been supplied to the jury.[37] In short, Judge Rombro conducted *976 a complete inquiry into the matter, delving into all areas about which defense counsel expressed concern.[38] The appellants' contention to the contrary is without merit.
In the alternative, the joint appellants contend that Judge Rombro's reliance on Wernsing, for the proposition that prejudice should not be presumed, was misplaced. In the appellants' view, Wernsing is inapplicable since it did not involve an intentional communication with the jury by a party to the case. The appellants urge this Court to adopt a rule that any communication with a jury by a party is presumptively prejudicial and requires an automatic mistrial.[39] We decline to do so.
Judge Rombro concluded that, while the distribution of the photographs was intentional, it was done under the mistaken impression that it was sanctioned by the court. All distributions were made through the court clerk and not by plaintiffs' counsel. The judge was satisfied that there was no prejudice whatsoever. Under the circumstances, the adoption of the automatic rule suggested by the joint appellants would serve only to punish the plaintiffs for a transgression they were unaware they were committing. It would not have a deterrent effect and, since there was no prejudice, would provide no cure. We therefore think it best to adhere to our general rule involving improper jury contact of any type. As we explained in Allen v. State, 89 Md.App. 25, 46, 597 A.2d 489 (1991), cert. denied, 325 Md. 396, 601 A.2d 129 (1992), "[i]t is well established in Maryland that in determining whether jury contact is prejudicial, a trial court must balance the `probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case.'" (Citation omitted). See Wernsing, 298 Md. at 416, 470 A.2d 802.
"In reviewing the trial judge's denial of a mistrial motion, we will not disturb the ruling absent a clear showing of abuse of discretion." Garrett, 343 Md. at 517, 682 A.2d 1143. We detect no abuse in Judge Rombro's exercise of discretion in denying the motion for mistrial below.

SUMMARY OF JOINT ISSUES
To summarize, we conclude that, while the trial below was indeed a complicated one, it did not overwhelm the jury. The record reflects that the jury was able to sort through the evidence and apply it to specific defendants and cross-defendants. The court properly listed product types rather than specific brand names on the verdict sheets, as the evidence indicated only that liability would attach, if at all, as to each product of a particular type manufactured, sold, distributed, or installed by a particular defendant or cross-defendant. In addition, the five trial plaintiffs properly served the purpose of giving the jurors an understanding of what a full asbestos case involves.
The joint appellants were not denied their right to a fair and impartial jury. The trial court properly proceeded with jury selection absent those prospective jurors who claimed hardships. Moreover, the court properly exercised its discretion in determining that *977 there was no Batson violation, and in determining that the submission of papers containing photographs and written descriptions of expert witnesses to the jury by plaintiffs' counsel did not warrant a mistrial.
We turn now to the arguments presented by the appellants individually.

- ARGUMENTS OF INDIVIDUAL APPELLANTS -

III

SUFFICIENCY OF THE EVIDENCE
In challenging the sufficiency of the evidence as to the various appellees, all of the appellants contend that Judge Rombro erred in denying their motions for judgment at the close of the plaintiffs' case and at the close of all evidence. Recently, in Grimshaw, 115 Md.App. at 187 n. 11, 692 A.2d 5, this Court reiterated that "[a]s long as [the] plaintiff has presented some evidence to support his theory of liability, the trial court should submit the issue to the jury." The jury, as trier of fact, must then determine if the plaintiff has proven that the defendant is liable. See Balbos, 326 Md. at 208-09, 604 A.2d 445; Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162-63 (4th Cir.1986).
In making its determination, the jury must apply the substantial factor test, which is also known as the "proximity, frequency, and regularity" test. Grimshaw, 115 Md.App. at 186, 692 A.2d 5. That is, the jury must consider "the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product." Balbos, 326 Md. at 210, 604 A.2d 445. It is not sufficient that the product was used anywhere and at any time at the workplace, regardless of whether the plaintiff was present. See id. at 216-17, 604 A.2d 445 (rejecting the "fiber drift theory"). "A plaintiff must show more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use.... A plaintiff must present evidence `to show that he inhaled asbestos fibers shed by the specific manufacturer's product.'" Grimshaw, 115 Md.App. at 186, 692 A.2d 5 (citation omitted). "`In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.'" Balbos, 326 Md. at 211, 604 A.2d 445 (citation omitted).
As the Court of Appeals has explained,
it is not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing judgment on a verdict.... Even if a jury verdict is "inconsistent" in the sense that certain findings of fact cannot logically be reconciled with each other, we will normally not reverse a jury's verdict either in a civil or a criminal case....
Garrett, 343 Md. at 521, 682 A.2d 1143 (citations omitted). Evidence will be deemed sufficient if it "`serves to prove a fact or permits an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover.'" Collier v. Eagle-Picher Indus., Inc., 86 Md.App. 38, 62, 585 A.2d 256 (citation omitted), cert. denied sub nom. Corhart Refractories v. Collier, 323 Md. 33, 591 A.2d 249 (1991).

A. Goodman
John Joseph Goodman was diagnosed with mesothelioma in January of 1993. He died just before trial, on February 2, 1994, at the age of 71. Goodman worked at the Standard Oil refinery in Baltimore from May of 1951 to October of 1957. At trial, Goodman's attorneys alleged that it was then that he was exposed to the asbestos that later caused his mesothelioma.[40]
Prior to his death, Goodman testified in a videotaped deposition de bene esse. The videotape was played and admitted into evidence at trial. In the deposition, Goodman testified that he worked as an insulator's helper at Standard Oil. An insulator's helper worked with an insulator insulating pipes, *978 boilers, and other equipment. The refinery employed seven such teams at a time. Goodman explained that, at Standard Oil, a variety of asbestos-containing insulation products were used, such as block, blankets, and cement. He testified that he worked "all over" the refinery and that, during his six-year tenure there, he applied enough asbestos-containing insulation to go "[f]rom here to California and back, five times."

- Rapid -
The jury found that Goodman was exposed to the products of Rapid's predecessor, Philip Carey Manufacturing Company, from 1951 to 1957. Rapid launches a two-pronged attack in response to the jury's verdict.
Rapid first points out that, although Goodman identified a variety of insulation products that he worked with at Standard Oil, he did not identify any Carey products. That identification came from another insulator's helper, Franklin Lloyd, who worked at Standard Oil from 1947 to 1956. Rapid concedes that, when a plaintiff is unavailable to identify a particular product to which he was exposed, that identification may be made by another witness. It argues, however, that when the plaintiff is available to testifyhere by videotaped deposition de bene esseany identification of a product must be made by the plaintiff.
Rapid's argument is without legal foundation. There is simply no rule of law that would prevent a plaintiff from relying on other witnesses to identify asbestos-containing products to which he or she was exposed. Indeed, two of the plaintiffs in Godwin, 340 Md. 334, 667 A.2d 116, did just that. Godwin plaintiff Leggette McNiel worked just outside an open hearth furnace shop at Bethlehem Steel's steelmaking facilities at Sparrows Point and was required to enter the shop several times a day. Although McNiel was available to testify at trial, he relied upon a witness who worked inside the shop to identify asbestos-containing products used there. 340 Md. at 350-353, 667 A.2d 116. Like Goodman, Godwin plaintiff Ira Russell died prior to trial and his videotaped deposition de bene esse was admitted into evidence. Russell was a pipefitter who worked for contractors who did work at Sparrows Point. His suit alleged that he contracted asbestosis from removing insulation applied to the pipes by Bethlehem Steel workers. Russell's case depended on the testimony of a Bethlehem Steel worker to identify the insulation products. Id. at 350, 353-55, 667 A.2d 116.
The rule that Rapid urges this Court to accept would severely handicap plaintiffs, in general, in the pursuit of their claims. Many of those persons now claiming to suffer from asbestos-related diseases allege that their exposures to disease-causing agents date back twenty to fifty years. Those plaintiffs whose memories might understandably be hazy would be prohibited from relying on witnesses with clearer recollections. Moreover, many potential plaintiffs, such as McNiel in Godwin, were bystanders who never worked with asbestos-containing products and never had knowledge of the products to which they were exposed. Such plaintiffs would be unable to rely upon witnesses who did have knowledge of the products. See Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods., 786 F.2d 1225, 1228 (4th Cir.1986) (reversing summary judgment in favor of defendants and explaining that trial court's requirement that plaintiff identify asbestos-containing products personally unless other identifying witness placed plaintiff at site was "unreasonable" and would "destroy an injured bystander's cause of action for asbestos exposure").
Rapid further argues that, even if Lloyd's testimony was sufficient to identify Carey asbestos-containing insulation products as products used at Standard Oil during the time of Goodman's exposure, the evidence was insufficient to establish that the products were a substantial factor in causing Goodman's disease. In Rapid's view, the evidence did not satisfy the proximity, frequency, and regularity test.
There is no dispute that the Standard Oil refinery was a large facility, covering several square miles and containing roughly ten million feet of piping. Lloyd testified that Carey was "one of the insulations used" at Standard Oilhe recalled seeing both Carey pipecovering and block throughout the *979 plant.[41] In his deposition de bene esse, Goodman testified that he worked "all over" the refinery insulating "anything that had to be heated." Both Goodman and Lloyd testified that, as insulators' helpers, they insulated boilers, and Lloyd told the court that all but one of the boilers were located "in one big boiler house."
While neither Goodman nor Lloyd testified to knowing or working with the other, the evidence made clear that they held identical jobs at Standard Oil at substantially overlapping times. Goodman testified that he worked eight hours a day, five days a week. He further testified that, on big jobs, up to six insulators and insulators' helpers worked together. Lloyd made clear that, while he was an insulator's helper, Carey pipecovering and block were used throughout the plant. On this, we are satisfied that a reasonable jury could infer that Goodman, like Lloyd, regularly worked with Carey products during his employment at Standard Oil. The evidence satisfied the proximity, frequency, and regularity test. See Asner, 344 Md. at 180-82, 686 A.2d 250 (although no direct evidence linked plaintiff Wilson to ACandS insulating cement, the jury could infer that Wilson was regularly exposed to the cement from evidence that he supervised workers who either used the cement or who worked near others who used the cement); Godwin, 340 Md. at 353-55, 667 A.2d 116 (although no direct evidence linked plaintiff Russell to Unibestos pipe covering, the jury could infer that Russell was regularly exposed to the pipe covering from evidence that it was available to be used at the plant by insulators during the time period that Russell worked there as a pipefitter).

- U.S. Mineral -
The jury determined that Goodman was exposed to U.S. Mineral's fireproofing spray in 1957. U.S. Mineral asserts that Goodman never mentioned that he was exposed to a spray product, and no other witness testified that a spray product was used at Standard Oil while Goodman worked there. According to U.S. Mineral, there was no suggestion whatsoever that U.S. Mineral's spray product, which was known as CAFCO, was used at Standard Oil at the relevant times.[42]
A review of the record supports U.S. Mineral's position. In his deposition testimony, Goodman specified that he was exposed to dust from asbestos-containing blocks, blankets, and cement. At trial, Eston Bonner, a former Hampshire employee, testified that he sprayed asbestos-containing fireproofing at Standard Oil "in the late `50s.... I would say from `57 through `60." He specified that he used a product known as "Spraycraft," however, which was not manufactured by U.S. Mineral.[43]
Bonner made clear that he used Spraycraft at Standard Oil "from `57 through `60." *980 Even if Bonner had identified CAFCO as the product he used, he did not specify when in 1957 he began spraying at Standard Oil. In the absence of any testimony from Goodman that he was exposed to any spray product, no rational inference could be drawn that Bonner began spraying before Goodman left in October of that year, much less that Bonner sprayed in Goodman's presence. Under the circumstances, the evidence was indeed insufficient to support the verdict in favor of Goodman.

- Hampshire -
According to the jury, Goodman was exposed to products used by Hampshire from 1951 to 1957. The parties tacitly agree that the jury's verdict concerned exposure to Hampshire's fireproofing spray.[44] Hampshire contends that the evidence was insufficient to support the verdict, in that there was no evidence that Hampshire sprayed at Standard Oil while Goodman was present. As we explained in our discussion as to U.S. Mineral, we must agree. There was simply no evidence from which the jury could draw the necessary inference.
In an alternative argument that is moot as to Goodman and, as we shall see, as to Morrow but is significant as to Theis and Glensky, Hampshire argues that, even if a trial plaintiff established exposure to its application of fire proofing spray, the evidence was insufficient to support the jury's finding that Hampshire was negligent. As we shall discuss infra, Hampshire disputes that its duty to warn was the duty imposed upon a nonmanufacturing supplier/installer. Apparently assuming arguendo that it should be held to that standard, however, Hampshire argues that it did not know and should not have known, prior to 1965, that asbestos-containing spray could be dangerous to bystanders. See Balbos, 326 Md. at 203-04, 604 A.2d 445 (indicating that, depending upon its peculiar opportunity and competence, a nonmanufacturing supplier may have a duty to discover information presented in nonobscure publications and to warn of those dangers that is, such a nonmanufacturing supplier should be held to a modified "knew or should have known" standard). Hampshire asserts that the trial plaintiffs alleged that they were exposed in the years prior to 1965, but that the plaintiffs failed to establish that "nonobscure" literature regarding dangers to bystanders was available prior to 1970.
Evidence that "nonobscure" literature existed prior to 1965 was introduced through Dr. Barry Castleman, who testified for the plaintiffs as an expert "in the fields of occupational health and health hazards of asbestos and the history of asbestos." Dr. Castleman listed more than a dozen articles published between 1933 or 1934 and 1964, which described diseases suffered by asbestos workers. The articles appeared in a variety of publications, including, in some cases, Lanceta "tremendously widely available medical journal" according to Dr. Castlemanand the New England Journal of Medicine. In response to a question by plaintiffs' counsel, Dr. Castleman agreed that these "were published in English, ... were nonobscure and ... were readily available, easily available to anybody in the United States or even in Baltimore who wanted to read those articles around the time they were published." As Hampshire acknowledges, moreover, the plaintiffs presented evidence that in 1939 the Legislature made asbestosis an occupational disease under the Maryland Workers' Compensation statute. See 1939 Laws of Maryland chapter 465, § 32A at 991-92; Md. Ann.Code art. 101, § 34 (1939).
Whether the articles described by Dr. Castleman were in fact "nonobscure" was a question for the jury, which was apprised of each and every publication in which a described article appeared. Likewise, it was for the jury to determine whether it could be inferred from the publications, which concerned users of asbestos-containing products rather than bystanders, as well as from the *981 Workers' Compensation statute, that asbestos-containing products posed a danger to bystanders as well as users.
Dr. Castleman gave a brief description of each article from which the jury could infer that, if the user was exposed, a bystander might be exposed as well. For instance, Dr. Castleman explained that one article described "chemical plant workers who were exposed to asbestos insulation and developed asbestosis...." Another discussed "a worker in an aluminum plant who got asbestosis from the dust created by wearing garments, safety clothing, gloves and things, to protect him from hot metals and splashing metals in an aluminum plant." There was an article "about a plumber's helper who got asbestosis from sawing pipecovering...." In addition, the Workers' Compensation statute suggested that one need not have been an asbestos worker to be entitled to compensation. It stated that any employee who contracted asbestosis from "[a]ny process or occupation involving an exposure to or direct contact with asbestos dust" could recover. Id. (emphasis added). On this evidence, we are satisfied that an ordinarily intelligent mind could draw a rational conclusion that Hampshire should have known of the dangers posed to bystanders by asbestos-containing sprays.

B. Ciotta
Leonard Ciotta suffered from a lung condition known as pleural plaques. Like Goodman, Ciotta alleged that he was exposed to the asbestos that later caused his condition while working at the Standard Oil refinery. Ciotta worked at Standard Oil from 1950 to 1956. He worked as a labor gang member for six months, then became a pipefitter's helper. As a pipefitter's helper, Ciotta assisted in installing and replacing pipes and other equipment. The job entailed tearing off old asbestos-containing insulation.
Ciotta, who was 73 at the time of trial, testified below. He testified, as did Goodman, that he worked "all over" the refinery. In particular, Ciotta recalled working "[i]n the boiler house a lot of times" with Goodman. Ciotta told the court that he often worked near the "asbestos workers," or insulators, while they were creating dust.

- Rapid -
The jury determined that Ciotta, like Goodman, was exposed to insulation products manufactured by Rapid's predecessor, Carey, from 1950 to 1956. Rapid contends that the evidence was insufficient to support the verdict in favor of Ciotta. It reiterates the arguments it made as to Goodman, arguing that Ciotta himself did not identify Carey products but relied upon Lloyd's identification, and that, in any event, the evidence as a whole failed to establish that Carey products were a substantial factor in causing Ciotta's condition. In addition, Rapid argues that the evidence was insufficient to establish that Ciotta suffered a legally compensable injury.
As we have explained, there is simply no rule of law that would prevent a plaintiff from relying on other witnesses to identify the asbestos-containing products to which he or she was exposed. Ciotta's reliance on Lloyd to identify Carey insulation products as products in use at Standard Oil during Ciotta's term of employment did not render the evidence presented by Ciotta insufficient.
We are satisfied, moreover, as we were in the Goodman case, that the evidence was sufficient to satisfy the proximity, frequency, and regularity test. Lloyd testified that Carey pipecovering and block were used throughout the plant. Ciotta testified that he worked "all over" Standard Oil, that his job entailed tearing asbestos insulation off of pipes and other equipment, and that he often worked with insulators who also created dust while they worked. We are satisfied that, on this evidence, a reasonable jury could infer that Ciotta regularly tore off Carey insulation products and worked near insulators who were using Carey insulation products. See, e.g., Godwin, 340 Md. at 353-55, 667 A.2d 116.
Nor are we persuaded that the evidence was insufficient to establish that Ciotta suffered a legally compensable injury. It is true, as Rapid contends, that "the condition known as pleural plaques, or even generalized pleural thickening, unaccompanied by *982 disabling consequences or physical impairment, is not a compensable injury as a matter of law." (Emphasis added.) See Owens-Illinois v. Armstrong, 87 Md.App. 699, 734-35, 591 A.2d 544 (1991) (jury instruction that pleural plaques and pleural thickening are not compensable injuries was proper absent any evidence of loss or detriment to plaintiff), aff'd in part and rev'd in part on other grounds, 326 Md. 107, 604 A.2d 47, cert. denied, 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992); MCIC, Inc. v. Zenobia, 86 Md.App. 456, 481-84, 587 A.2d 531 (1991) (trial court properly instructed jury that it could not award damages for pleural plaques unless it found that plaintiff was actually harmed), vacated on other grounds, 325 Md. 420, 601 A.2d 633 (1992); Wright v. Eagle-Picher Indus., Inc., 80 Md.App. 606, 614, 565 A.2d 377 (1989) (jury instruction that pleural plaques are not a compensable injury was proper absent any evidence of loss or detriment to plaintiff). Rapid asserts that, "[i]n the Ciotta case, there was absolutely no objective evidence of any functional impairment." This assertion is belied by the record.
Ciotta testified that, about four years before trial, he began experiencing shortness of breath which made it difficult for him to cut his lawn and do other chores around his house. His symptoms progressively worsened until he could no longer climb two flights of steps, walk a golf course, engage in sexual relations with his wife, or dance except for a "slow number" now and then. About two years after the symptoms began, Ciotta received a letter from his trade union regarding asbestos-exposure and was urged to have a chest X-ray. Ciotta got the X-ray and the doctors recommended further testing. Eventually, Ciotta was informed that he had scar tissue on his lungs. Ciotta admitted that, from 1955 until 1985, he had smoked approximately two packs of cigarettes a month.
Dr. David Schwartz testified for the plaintiffs as an expert in the areas of internal medicine, pulmonary medicine, and occupational medicine. Dr. Schwartz examined Ciotta prior to trial. The doctor explained that the visceral,pleura is the lining around each lung, and the parietal pleura is the lining inside the chest wall. He stated that "asbestos can cause scarring and fibrosis of both of those areas," which he referred to as "pleural disease."[45] Dr. Schwartz opined that Ciotta had extensive asbestos-induced pleural disease, with pleural plaques in both the visceral pleura and parietal pleura. He performed testing upon Ciotta which confirmed that Ciotta had reduced lung capacity which, in his view, was caused by the pleural plaques. According to Dr. Schwartz, the condition was irreversible.
Dr. Schwartz acknowledged that Ciotta was overweight and had been a "minimal" smoker. He testified, however, that neither excess weight nor smoking causes pleural plaques. The doctor stated that, while Ciotta's excess weight might be a factor in his shortness of breath, it was not the cause of it. Dr. Schwartz acknowledged that testing showed that Ciotta had a heart conditiona "mild mitral tricuspid and aortic insufficiency"but stated that the condition would not cause the type of shortness of breath that Ciotta was experiencing.
Dr. Schwartz testified that Ciotta's condition put him at an increased risk for other asbestos-related complications such as asbestosis, lung cancer, and mesothelioma, such that his condition would require future monitoring. In fact, he stated that Ciotta's "shortness of breath and reduced lung volumes suggest, also, that he has asbestosis that is not ... clinically evident on the chest X-ray." The doctor added that Ciotta's pleural disease impaired his ability to fight off respiratory infections and "other intercurrent *983 illnesses, like heart disease, that put stress on the lungs."
It is thus clear that there was ample evidence that Ciotta's pleural plaques were accompanied by physical impairment. Rapid's argument goes more to the weight of the evidence than the sufficiency. As we have indicated, supra, "it is not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing judgment on a jury verdict." Garrett, 343 Md. at 521, 682 A.2d 1143.

C. Theis
Terry Theis became a steamfitter after he graduated from high school. From 1962 to 1967, he worked as an apprentice for Mitchell. At trial, Theis testified that he worked at many job sites for Mitchell, but there were four major sites. Theis stated that he spent 13 to 15 months each at Murphy Homes, City Hospitals, the Federal Office Building, and the Lever Brothers plant, in that order.
Theis explained that, as a steamfitter, he repaired and replaced piping systems. He himself handled asbestos-containing gaskets, blankets, rope, and packing. In addition, he was exposed to asbestos-containing pipecovering, block, cement, and spray used by other trades. In the fall of 1992, while he was still working as a steamfitter, Theis developed a cough and began experiencing shortness of breath. He was referred to a pulmonologist, who diagnosed him as suffering from asbestosis. The doctor confirmed that Theis's asbestosis was caused by occupational exposure to asbestos. Theis was 53 years old at the time of trial.

- Crane -
The jury found Crane, a manufacturer of sealing products, negligent and strictly liable as to its packing but not its gaskets. The jury further found Crane liable to Theis for exposures from 1962 to 1980.[46] Crane points out that Theis testified that some of the gaskets he used while working for Mitchell were manufactured by Crane. Theis stated that another company manufactured the packing he used. No other witness identified Crane packing as a product used by Theis. Crane therefore concludes: "Because there is absolutely no evidence that Mr. Theis ... was exposed to John Crane packing products, as opposed to gasket products, the jury's verdict that exposure to John Crane products from 1962 to 1980 was a substantial factor in causing [his] disease[] is clearly inconsistent with the uncontroverted evidence."
There is considerable question as to whether this argument, as well as an identical argument as to Glensky, is preserved for appellate review. The appellees assert that, although Crane moved for judgment on several grounds at the close of the plaintiffs' case and again at the close of all evidence, it challenged the sufficiency of the product identification evidence only as to Goodman and Ciotta. See generally Md. Rule 2-519(a) (in moving for judgment, "[t]he moving party shall state with particularity all reasons why the motion should be granted"). Crane expressly acknowledged that there was evidence that Theis and Glensky were exposed to Crane "gaskets and/or packing." Crane contends on appeal that, because when the motions for judgment were made it did not yet know what form the verdict sheets would take or that the jury would find liability for packing but not gaskets, it could not have known to move for judgment as to its packing on the ground that the only evidence presented as to Theis and Glensky concerned gaskets. Crane contends that it raised the matter in post-trial motions, and suggests that that was sufficient to preserve it for appeal. We are nonplussed by Crane's contentions. In any event, assuming without deciding that the argument is preserved, we find it to be without merit.
As we explained supra, in our discussion as to the joint appellants' challenge to allegedly erroneous jury verdicts, Theis testified that he worked with Crane gaskets and that he often had to cut the gaskets from sheets. A Crane catalog that was admitted into evidence *984 lists several pages of asbestos sheet packing, and notes that gaskets can be cut from the sheet packing. It is apparent that the jury concluded that Theis cut the gaskets he used from sheet packing designed for that purpose. The jury's verdict was not inconsistent with the evidence.
In the alternative, Crane assertsas it asserted in its motions for judgmentthat the plaintiffs failed to present expert testimony that Crane products, in particular, emitted respirable asbestos fibers.[47] Crane asserts that, in the absence of such testimony, Crane `"was entitled to the entry of judgment in its favor upon its Motions at the close of the Plaintiffs' cases, and again at the close of all evidence." As support for its position, Crane improperly cites several unpublished memoranda from other jurisdictions. See Contreras v. Hawk, Nos. 95-1810 and 95-2126, 1996 WL 72352 (7th Cir. February 14, 1996); Nogan v. GAF Corp., No. 88-0334, 1989 WL 161541 (M.D.Pa. May 22, 1989); Delaney v. Porter Hayden Co., No. L-40701-85 (N.J.Super.Ct. May 20, 1986). We are not bound by these decisions, and we decline to adopt the rule urged by Crane. We shall not hold that a plaintiff in any asbestos case must present expert testimony as to the amount of respirable asbestos fibers emitted by a particular product. Under the peculiar circumstances of this particular case, the evidence against Crane was sufficient without such testimony. See, e.g., In re New York Asbestos Litigation, 847 F.Supp. 1086, 1094-95 (S.D.N.Y.1994) (evidence that pipe contained asbestos, dust was created when pipe was handled, and plaintiff breathed dust was sufficient to establish exposure to respirable asbestos fibers, even without expert testimony), aff'd in part, vacated in part on other grounds sub nom. Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003 (2d Cir.1995), vacated and remanded sub nom. Consorti v. Owens-Corning Fiberglas Corp., 518 U.S. 1031, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996); Junge v. Garlock, Inc., 427 Pa.Super. 592, 629 A.2d 1027, 1029-30 (1993) (rejecting contention that a plaintiff in an asbestos case must present expert testimony as to how many asbestos fibers are contained in dust emissions from a particular asbestos-containing product).
Theis testified that he cut gaskets from sheets using a saw or "ball-peen" hammer. He explained that he was 12 to 16 inches from the materials when he cut the gaskets, that the process created visible dust, and that he breathed the dust. Dr. James R. Millette, who testified as an expert witness for the cross-plaintiffs and whose testimony was adopted by the plaintiffs, testified that gaskets and packings, in general, are not considered "friable"that is, they do not emit respirable asbestos fibersbut they become friable if "cut or torn."[48] As we have observed, Dr. John McCray Dement, an expert witness for the plaintiffs, testified to the effect that, whenever any asbestos-containing product is manipulated to the extent that it creates visible dust, "a very significant health hazard" is presented.
Crane employee George McGillop testified on cross-examination below that Crane had *985 conducted studies of workers at its manufacturing plant "when they were cutting gaskets or cutting rings for fiber release to see about the asbestos at that time." McGillop explained that the workers who were studied had
a small machine, and it looks like a microphone near their mouth.
And as they are cutting the rings, cutting the gaskets or braiding the material, the asbestos fiber in the air gets onto this filter.
And the filter is then taken to the laboratory. And through some type of microscope, they determine the amount of fibers that are picked up within an eight-hour period.
Thereafter, Judge Rombro permitted the plaintiffs to offer Crane's own plant monitoring reports into evidence to rebut evidence presented by Crane to the effect that its finished products did not emit respirable asbestos fibers.[49] The reports, which were prepared from 1976 to 1985 pursuant to Occupational Safety and Health Administration requirements, revealed that unsafe levels of asbestos fibers were released into the air breathed by the workers during a number of manufacturing processes. One such process was described as the "production of gaskets from sheet packing by use of dyes and circle cutter."
On the evidence before us, we are satisfied that "`an ordinarily intelligent mind [could] draw a rational conclusion'" that Crane packing emitted respirable asbestos fibers. Collier, 86 Md.App. at 62, 585 A.2d 256 (citation omitted). It could further conclude that Theis was exposed to such fibers when he cut gaskets from Crane sheet packing, and that the exposure was a substantial factor in causing his illness.

- U.S. Mineral -
The jury found U.S. Mineral liable to Theis based on exposures to its fireproofing spray in 1962 and 1963. As we observed in our discussion of U.S. Mineral's appeal as to Goodman, that spray was known as CAFCO. The company contends: "[T]here is a complete absence of evidence to support the jury's finding that Mr. Theis was exposed to CAFCO." We must agree.
Theis worked for Mitchell from 1962 to 1967. He testified that he believed he was exposed to fireproofing spray while working for Mitchell at Murphy Homes and City Hospitals. Theis did not identify the manufacturer of the spray, although he stated that Hampshire was the spray contractor at Murphy Homes. Hampshire employee Eston Bonner testified that he sprayed CAFCO at Murphy Homes sometime in the late 1950s. Although Bonner did not recall spraying at Murphy Homes in the 1960s, he acknowledged that he testified in an earlier *986 deposition that he sprayed Spraycraft there sometime in the "middle '60's." As we have observed, Spraycraft was not a U.S. Mineral product. Bonner further testified that he used Spraycraft at City Hospitals sometime in the early 1960s. A Hampshire executive confirmed that U.S. Mineral stopped selling spray fireproofing to Hampshire in 1959.
No other testimony was presented regarding spraying at Murphy Homes or City Hospitals, or any other location where Theis might have been working. As U.S. Mineral contends, there was simply no evidence from which the jury could properly infer that Theis was ever exposed to U.S. Mineral's spray product.

- Stebbing -
The jury also found Stebbing liable to Theis for exposures in 1964 and 1965. The parties agree that the finding necessarily involved Stebbing's application of fireproofing spray.[50] Stebbing argues that the trial plaintiffs failed to present any evidence that Theis was ever exposed to spraying by Stebbing. Again, we must agree.
To reiterate, Theis testified that he believed he was exposed to fireproofing spray only at Murphy Homes and City Hospitals. He stated that he worked at Murphy Homes, City Hospitals, the Federal Office Building, and the Lever Brothers plant, in that order, for 13 to 15 months each beginning sometime in 1962.
The trial plaintiffs presented the testimony of witness Frank Bunjon to establish that Stebbing was involved in spraying. Bunjon had worked for Stebbing as a plasterer. He stated that, in the early 1960s, he was plastering for Stebbing at the Federal Office Building while other Stebbing employees sprayed Spraycraft fireproofing there. Bunjon testified that the spray made the air very "foggy," that it "permeate[d] the entire work area," and that workers from "[a]ll of the crafts" were present. Bunjon did not identify Theis as being on the scene.
As Stebbing points out, Theis did not so much as suggest that there was a possibility that he was exposed to spraying at the Federal Office Building. Bunjon could not identify Theis as being present when the spraying was done there. Bunjon stated that the spraying was done in the early 1960s. Using the time frames testified to by Theis, Theis could not have been at the building before mid 1964.[51] As Stebbing contends, the jury could not have properly concluded, on the evidence before it, that Theis "was exposed to any fireproofing ... that was performed by a Stebbing employee, let alone that it was on a regular, frequent and proximate basis which would have been a substantial factor in the production of his asbestosis."

- Hampshire -
Hampshire was found liable to Theis for exposures from 1962 to 1964. Hampshire acknowledges that Theis identified it as the company that sprayed fireproofing in the boiler room of Murphy Homes while he was working there. It argues only that "his case plainly does not meet the `frequency, regularity, proximity' test." Hampshire posits that "[a]t best, [Theis's] evidence limits his exposure to Hampshire's spray work only to an unidentified portion of a few days in a boiler room at Murphy Homes...."
To the contrary, Theis testified that he was working at Murphy Homes at the same time Hampshire workers were there spraying. Theis was questioned as follows:
Q Now, when they did this spraying, would they say okay, everybody out of the room, we are going to spray?
A No, they didn't.

*987 Q Were there ever times you were in the room when they just opened up with the spray?
A Yes, there were, often.
Theis specifically recalled working in the boiler room of Murphy Homes when Hampshire was spraying. He stated that the room was the size of a courtroom, and that the spray created so much dust that he wouldn't have been able to see the jury from the witness stand.
Hampshire's argument that this evidence was not sufficient to satisfy the substantial factor test ignores the nature of fireproofing spray. Hampshire employee Eston Bonner testified that, when such spraying is done, bags of material are dumped into a "hopper." The material "is mixed up in there, comes out through a hose, is applied with water on the other end." Bonner told the court that "lots of dust" was created, so much so that workers in other trades would complain and, at times, "tempers would flare, and people would get mad." Bonner added that seven to ten-percent of the material would fall off of the items being sprayed. Bonner explained that Hampshire used U.S. Mineral's CAFCO spray in the 1950s and switched to Spraycraft, which was manufactured by another company, in the 1960s.
In short, there was evidence that, on several occasions while he was working at Murphy Homes, Theis worked in the same room as Hampshire employees who were applying fireproofing spray. That spray created so much dust that it was difficult to see. The evidence amply satisfied the substantial factor test.

D. Glensky
Frederick Glensky was 45 years old at the time of trial. He was the son of a steamfitter, Robert Glensky. Robert Glensky worked for Mitchell at the same time that Theis worked for that company. Glensky testified that, as a child, one of his "duties" was to take his father's work coveralls into the basement and shake them out so that his mother could launder them.
While in high school, Glensky worked part-time assisting his father. In 1970, after he graduated from high school, Glensky became an apprentice steamfitter. In 1976, he became a steamfitter like his father.
Sometime in 1985, Glensky began experiencing shortness of breath. He sought medical help and learned that he had a tumor in his right lung. The tumor, which was benign, was removed in 1990, along with between one-third and one-half of his lung. Glensky was also diagnosed as having asbestosis.

- Crane -
The jury determined that Crane was liable to Glensky for exposures occurring from 1962 to 1980. Crane argues, as it argued in regard to Theis, that the evidence suggested only that Glensky was exposed to Crane packing and not Crane gaskets.
We have made clear that the jury could have properly concluded that workers who cut gaskets from Crane sheet packing were actually working with Crane packing. Glensky testified that, as an apprentice steamfitter from 1970 to 1976, he regularly used Crane gaskets as well as gaskets manufactured by other companies. He explained that he worked with precut gaskets and with "sheet gaskets that we would have to cut." In addition, Theis testified that, when he worked for Mitchell, he worked closely with Glensky's father. Theis testified that he used gaskets manufactured by Crane, among other companies, and that the gaskets sometimes had to be cut from sheets. It could thus be inferred that Robert Glensky, like Theis, was exposed to dust when Crane sheet packing was cut into gaskets, and that Robert Glensky carried that dust home with him on his coveralls.[52] The evidence was sufficient *988 to establish that Glensky was exposed to Crane packing.

- U.S. Mineral -
The jury determined that Glensky was exposed to U.S. Mineral's fireproofing spray from 1962 to 1963. U.S. Mineral points out that Glensky's case was "piggy-backed" to Theis's case, in that Glensky alleged that he was exposed to asbestos dust brought home on his father's clothes, and Theis provided the only testimony that Glensky's father was exposed to fireproofing spray. U.S. Mineral argues that the verdict in favor of Glensky should be reversed for the same reason that the verdict in favor of Theis must be reversed.
Theis stated that he worked with Glensky's father at Murphy Homes and City Hospitalsthe two locations at which Theis believed he was exposed to asbestos-containing spray. Theis specifically recalled that Robert Glensky was with him in the boiler room at Murphy Homes when Hampshire was spraying there.[53] As we have concluded, however, the evidence was insufficient to establish that Theisand therefore Robert Glenskywas exposed to U.S. Mineral's product at either location. Like the verdict in favor of Theis, the verdict in favor of Glensky must be reversed.

- Stebbing -
Stebbing was found liable to Glensky for exposures occurring in 1964 to 1965. Again, Glensky's exposures were to asbestos dust from Robert Glensky's clothes. Again, Glensky's case was "piggy-backed" to Theis's case. Stebbing argues that, like the verdict in favor of Theis, the verdict in favor of Glensky must be reversed.
The parties agree that the only evidence that could possibly link Robert Glensky to spraying by Stebbing concerned spraying at the Federal Office Building. Theis testified that he worked with Robert Glensky at the Federal Office Building, and his testimony suggested that their work there began sometime around mid 1964. Theis did not testify that he was exposed to spraying at that building. Stebbing employee Frank Bunjon stated that he plastered at the Federal Office Building sometime in the early 1960s while other Stebbing employees were applying fireproofing spray. Bunjon did not identify either Theis or Robert Glensky as being present at the time. As in Theis's case, the evidence failed to establish that Glensky was exposed to spraying by Stebbing.

- Hampshire -
The jury found Hampshire liable to Glensky for exposures from 1962 to 1964. Glensky's case against Hampshire rested on Theis's case, in that Glensky again alleged that he was exposed to asbestos dust brought home on his father's clothes after his father worked with Theis. Hampshire argues that, even if the evidence was sufficient to establish its liability to Theis, it was not sufficient to establish that Robert Glensky was exposed to its application of fireproofing spray, or that any such exposure was a substantial factor in causing Fred Glensky's illness.
To recount, Theis testified that Robert Glensky worked with him in the boiler room at Murphy Homes while Hampshire was spraying. Theis testified that the room was the size of a courtroom, and that the spray created so much dust that he wouldn't have been able to see the jury from the witness stand. Theis specifically recalled that Robert Glensky's clothes were covered with white dust. Hampshire employee Eston Bonner told the court that the spraying process created so much dust that workers in other trades would complain and, at times, "tempers would flare, and people would get mad."
Dr. Howard Kipen testified for the plaintiffs as an expert in the fields of internal medicine, preventive medicine, and occupational *989 medicine. Dr. Kipen testified it was most likely that Glensky was occupationally exposed to asbestos for the first time when he worked with his father while in high school. He added that Glensky "probably had [much earlier] asbestos exposure as a consequence of his father's employment in... occupations that entailed asbestos exposure." The doctor explained that the earlier exposures were not necessarily "sporadic," in that "asbestos is fairly indestructible. Once it would get into a place in the house or the car or whatever, unless somebody used appropriate kinds of HEPA vacuums or other things, it might be around for quite awhile." Dr. Kipen concluded that each and every exposure that Glensky had was a substantial contributing factor in the causation of his disease. Another medical doctor called by the defendants confirmed that household exposure to asbestos dust, such as that caused by shaking out dusty clothing, "can cause disease, there is no doubt about it." See generally Grimshaw, 115 Md.App. at 191-98, 692 A.2d 5 (holding that plaintiff Granski, who laundered her stepfather's clothes after he was exposed to defendant manufacturer's products, was a foreseeable plaintiff such that defendant owed her a duty to warn, and that evidence was sufficient to establish that defendant's product was substantial factor in causing Granski's mesothelioma).
In sum, there was evidence that Glensky's father was exposed to spraying by Hampshire, that he carried dust from the spraying home on his coveralls, and that Glensky was exposed to the dust when he shook off the coveralls. There was medical testimony that household exposure to asbestos dust can cause disease. The evidence was sufficient to permit the jury to conclude that Glensky's exposure was a substantial factor in causing his illness.

E. Morrow
Carroll Morrow was diagnosed with mesothelioma in June of 1993. Morrow testified at trial but died before the case went to the jury. He was 77 years old.
Morrow testified that he worked at the Western Electric plant from 1941 until 1979. From 1941 until 1962, Morrow worked as a pipefitter. He worked primarily in the plant's wire insulation building. In 1962, Morrow became a plant inspector.
Morrow's work as a pipefitter involved repairing and replacing piping systems. To that end, Morrow used a variety of asbestos-containing products, including gaskets, packing, and pipecovering. According to Morrow, all of these products created dust which he breathed. Once he became an inspector, Morrow did not personally work with the products, but he would work "right next to" the pipefitters whose work he was inspecting.

- Crane -
The jury determined that Morrow was exposed to Crane packing from 1941 to 1980. Crane argues that the evidence indicated only that Morrow worked with Crane packing for two weeks each year from 1941 to 1946, when the Western Electric plant was shut down and all leaks were fixed. Crane concludes that this exposure was insufficient to satisfy the substantial factor test.[54] It adds that "[t]here is no way to determine whether the jury would have found Mr. Morrow's actual limited exposure ... to be a substantial factor in the development of Mr. Morrow's disease" had it limited its determination to the proper time period.
We need not concern ourselves with whether the jury would have made such a determination, as Crane's argument is based on a faulty premise. The evidence simply did not suggest that Morrow was exposed to Crane packing for only two weeks a year from 1941 to 1946. Morrow testified that he used packing whenever he had to repair a leak. The plant was shut down for two weeks each year, and all leaks were repaired. Morrow did not suggest that leaks were repaired only during that two-week period. To the contrary, his testimony indicated that, as a pipefitter, he repaired and replaced piping on a "day-to-day basis." Morrow admitted that he stopped working personally with *990 packing after 1946, but did not suggest that he stopped working closely with workers who did use packing.[55] As we have observed, Morrow testified that as a plant inspector he worked "right next to" the pipefitters whose work he was inspecting.
As Crane concedes, Morrow testified that Crane and Garlock packing was used at Western Electric.[56] When a leak was repaired, old packing was torn out and replaced with new packing. Morrow explained that dust was created when packing was removed, and he breathed in the dust. On the evidence presented, we are satisfied that the jury properly concluded that Morrow was exposed to Crane packing on a regular basis from 1941 to 1979, when he retired. We find the jury's error in determining that Morrow was exposed until 1980, beyond his date of retirement, to be de minimis. We are satisfied that, had the jury considered Morrow's exposures only until 1979, it would nevertheless have properly found the exposures to have been a substantial factor in causing his illness.

- U.S. Mineral -
According to the jury's verdict, Morrow was exposed to U.S. Mineral's fireproofing spray from 1955 to 1960. U.S. Mineral challenges the verdict, arguing that there was no evidence that Morrow was exposed to its product or to any fireproofing spray whatsoever.
The Western Electric plant was comprised of several buildings and was approximately three miles long and one-and-one-quarter miles deep. Morrow indicated that he worked primarily in the wire insulation building until he became a plant inspector in 1962. That building was about 600 feet long by 600 feet wide, with ceilings about 40 feet high. As U.S. Mineral contends, Morrow did not testify that he was ever exposed to fireproofing spray. Nor did any other witness testify that Morrow was present when spraying was done. The only evidence as to possible exposure came from Hampshire employee Eston Bonner.
Bonner testified that Hampshire sprayed fireproofing at Western Electric "on and off" from "the mid `50s to approximately up to `65...." Initially, Hampshire used U.S. Mineral's CAFCO but later switched to Spraycraft.[57] Bonner testified that Hampshire sprayed throughout the plant, including in the wire insulation building, but added: "These were small jobs. They were not large jobs."
In short, there was no suggestion that Hampshire sprayed U.S. Mineral's product or any other spray productin the wire insulation building before Morrow's promotion in 1962, or that it sprayed anywhere else in the plant while Morrow was present. The evidence was insufficient to support the verdict. See, e.g., Balbos, 326 Md. at 215-17, 604 A.2d 445 (evidence that defendant sometimes installed asbestos-containing insulation products at Bethlehem Steel's Key Highway Shipyard during four-year period that plaintiff was employed there was insufficient to establish that plaintiff was exposed to dust from products).

- Hampshire -
Finally, the jury determined that Hampshire was liable to Morrow for exposures from 1941 to 1965. Hampshire concedes that it sprayed fireproofing at the plant while *991 Morrow was employed there, but argues that there was no evidence that Morrow was ever exposed to the spray. Hampshire concludes: "Morrow established no basis for any permissible inference that he was actually exposed to Hampshire's spray work. It also must follow that Morrow's evidence certainly fell short of the `frequency, regularity, proximity' test." Hampshire shall prevail for the same reasons that U.S. Mineral must prevail.
Morrow did testify that he saw Hampshire employees applying plaster at the plant not long after he started working there, and that while he worked as a pipefitter he saw Hampshire employees "[o]ff and on, different places, different buildings." Morrow did not specify what the workers were doing on those subsequent occasions. As we have explained, although Bonner testified that Hampshire employees sprayed fireproofing at Western Electric from the mid 1950s to 1965, Bonner did not identify Morrow as being at the scene of any spray applications and Morrow did not suggest that he was exposed to any spray. Because of the size of the plant, it simply could not be properly inferred from the mere fact that spraying was conducted that Morrow was exposed. See id.

IV

RAPID'S ALLEGATION OF DISCOVERY VIOLATION
As our discussions as to the sufficiency of the evidence in the Goodman and Ciotta cases indicate, the verdicts against Rapid in favor of Goodman and Ciotta hinged on the Carey product identification testimony of Franklin Lloyd. Rapid asserts that it was blindsided by Lloyd's testimony, in that the plaintiffs never identified Lloyd during discovery as a witness who would identify Carey. Rapid further asserts that, on the morning that Lloyd testified, plaintiffs' counsel assured counsel for Rapid that Lloyd would not identify Carey.
On direct examination of Lloyd, plaintiffs' counsel showed Lloyd a photograph. The examination proceeded as follows:
Q Now, do you recognize that box and name on the box?
A I have seen it, sure.
Q And when do you recall seeing that name?
A Well, I seen it quite a few times around the refinery.
Q The Standard Oil Refinery we are referring to?
A Standard Oil Refinery.
Q What is the name that appears on that box?
A Carey.
Q And did Carey make any other product other than pipecovering that was used down at Standard Oil?
A I don't recall that, no, not thatno, or if theyI recognize thethey made this block insulation. I remember seeing block type, which is rectangular blocks six inches wide by 36 inches long.
Q Okay. Do you recall the Carey pipecovering and block being used throughout the Standard Oil plant?
A Yes.
Q And did that create the dust that you described also?
A That was one of the insulations.
Q And based on your experience working at Standard Oil, didcould you see any way for the other workers to avoid working in the dust?
A Not unless they want to walk off the job, unless they wanted to just walk off the job. No, we all worked in conjunction of the pipefitters, boilermakers and
Q Now, sir, do you recall being deposed on Februarywell, do you recall being deposed earlier?
A I am sorry?
Q Do you recall sitting in a room with a bunch of lawyers and being quizzed?
A Yes, I do.
Q That is called a deposition. Yours was taken on February 9, 1991 and I was with you; do you recall that?
A I remember.
Q You did not mention Carey pipecovering in this deposition.

*992 Can you explain to the ladies and gentlemen of the jury why you did not recall Carey at that time?
A Well, I probably couldn't think of it at the time. There wasI guess I must have missed a lot of stuff.
They were all throwing questions at me and I supposeI know there was probably some refractory cements and clays that I never mentioned....
Rapid's counsel elected not to cross-examine Lloyd.
After Lloyd left the stand, Rapid moved to strike his testimony on the ground of unfair surprise. Rapid's counsel informed the court that counsel for the plaintiffs had assured him that very morning that Lloyd would not identify Carey products. The following discussion took place between counsel for the plaintiffs and Judge Rombro:
[PLAINTIFFS' COUNSEL:] Your Honor, in the case of Mr. Lloyd, he identified in his deposition Owens-Illinois Kaylo, A.P. Green, Ruberoid, Armstrong, Johns-Manville and a number of other products that I on direct chose not to elicit from him.
And he testified regarding Carey, Harbison-Walker and General Refractories and he had not testified about them in his deposition.
I was uncertain as to what his testimony was going to be
THE COURT: You didn't know that he was going to identify Westinghouse and Carey?
MR. CANDON [PLAINTIFFS' COUNSEL]: Your Honor, he is the original absentminded professor and I didn't know what he was going to be saying, and I justI am in a quandary as to what I am supposed to tell the defendant. I don't know if
THE COURT: I know one thing, I don't know what you are supposed to tell them either, but I know that if you tell them somebody is not going to identify their product, then I am not going to let you identify their product.
You tell them that this guy isn't going to say that and then he gets on the stand and he does it, that is not playing fair.
Whether you werewait a minute, I didn't say you solicited it, but even if you were surprised as Mr. Quarles [Rapid's counsel] was, that is not appropriate.
Now, if you even think it is going to happen, you got to alert them after that.
Judge Rombro nevertheless denied Rapid's motion to strike Lloyd's testimony. The judge instructed counsel for the plaintiffs to provide Rapid's counsel with a copy of Lloyd's deposition, and assured Rapid's counsel that Lloyd would be recalled for further examination if counsel so desired. Rapid now contends that Judge Rombro erred by refusing to strike Lloyd's testimony.
Preliminarily, we point out that we are not persuaded by the appellees' contention that Rapid waived its argument by failing to object to Lloyd's testimony as it was elicited and by failing to state expressly, in moving to strike the testimony, that the plaintiffs had failed to mention in discovery proceedings that Lloyd would be a product identification witness against Carey. As to the appellees' assertion that Rapid failed to object to the testimony as it was elicited, we note that counsel for Rapid informed this Court during oral argument that, on the day of Lloyd's testimony, the courtroom was so crowded with attorneys that he was relegated to a seat outside the bar and several rows back. Counsel indicated that he simply could not make what would ordinarily be considered a "timely" objection. Judge Rombro's thorough consideration of the motion to strike suggests to this Court that, under the circumstances, counsel was not expected to do so. A trial court has broad discretion in determining whether an objection or motion to strike is timely. As the Court of Appeals has explained:
The rule requiring objections to testimony to be made promptly is for the purpose of facilitating rather than retarding the administration of justice, and should receive a reasonable interpretation, and even when the objection comes after a question has been answered, if it appears that the delay was inadvertent and unintentional, *993 and what, under all circumstances was reasonable diligence, was exercised, or that not sufficient opportunity had been given to make it sooner, the objection will be considered to have been taken in time.
Mitchell v. Slye, 137 Md. 89, 100, 111 A. 814 (1920) (objection made after question was answered with testimony that could not have been anticipated) (emphasis added). As to the appellees' assertion that Rapid failed to argue, in moving to strike the testimony, that the plaintiffs had failed to reveal through discovery that Lloyd would be a product identification witness against Carey, we note that Rapid's counsel specifically informed the court: "[W]e didn't get any discovery about [the identification by Lloyd]." The record makes clear that Judge Rombro was well aware that Rapid was alleging unfair surprisethat is, that it had never been informed that Lloyd would identify Carey products.
In any event, we are satisfied that the trial court properly denied Rapid's motion to strike. Judge Rombro indicated that he accepted the assertion of plaintiffs' counsel, that he did not know when he showed Lloyd the photograph whether Lloyd would be able to identify Carey products. The judge made clear to plaintiffs' counsel that if counsel so much as suspected that a witness would identify a product, he was required to reveal his suspicions to defense counsel. The judge then fashioned what he believed was an appropriate remedy under the circumstances. He directed plaintiffs' counsel to supply Rapid's counsel with a copy of Lloyd's deposition, and informed Rapid's counsel that he could recall Lloyd and question him further.
"[T]he trial judge is vested with a large measure of discretion in applying sanctions for failure to adhere to the discovery rules." Klein, 284 Md. at 56, 395 A.2d 126. See generally Md. Rules 2-432 and 2-433. Factors to be considered by the court in divining an appropriate sanction include whether the violation was willful or contumacious, whether the opposing party lodged a proper and timely objection, and, most important, whether the opposing party was prejudiced by the violation. See Klein, 284 Md. at 54-56, 395 A.2d 126. See Beck v. Beck, 112 Md.App. 197, 210 n. 1, 684 A.2d 878 (1996), cert. denied, 344 Md. 717, 690 A.2d 523 (1997); Bartholomee v. Casey, 103 Md. App. 34, 48-49, 651 A.2d 908 (1994), cert. denied, 338 Md. 557, 659 A.2d 1293 (1995).
Rapid argues that, because it did not learn that Lloyd would identify Carey products until Lloyd was on the witness stand, it "had no ability to investigate Mr. Lloyd's testimony, credibility, and/or other related issues so as to prepare a meaningful cross-examination of this witness." As to Judge Rombro's offer to recall Lloyd to the stand at a later time, after Rapid had an opportunity to prepare for cross-examination, Rapid contends: "To recall Mr. Lloyd laterafter his damage had been donewould have only highlighted the significance of Mr. Lloyd's testimony and provided Plaintiffs with yet another opportunity, on redirect examination, to underscore the importance of his testimony to them." Rapid concludes that the only adequate solution was to strike Lloyd's testimony. While we recognize that Rapid was indeed surprised and that Lloyd's testimony was damaging, we do not accept this conclusion.
Rapid was fully aware that the plaintiffs intended to call a witness to identify Carey products as products used at Standard Oil. Indeed, Rapid asserts that the plaintiffs originally indicated that they intended to call a different witness, John Schauman, to identify the products. For some reason which the parties do not explain, the plaintiffs never called Schauman. Instead, they relied upon Lloyd's testimony. There is no indication that the substitution of Lloyd for Schauman in any way changed the nature of the allegations against Rapid or required Rapid to mount its defense differently. Compare Bartholomee, 103 Md.App. at 46-51, 651 A.2d 908 (trial court abused discretion by admitting plaintiff tenants' evidence regarding lead paint abatement methods used by defendant landlord where tenants stated, in response to interrogatories, that they were satisfied with abatement methods and did not indicate until the eve of trial that they intended to present evidence that the methods were inadequate). Rapid merely had to determine how to impeach the credibility of Lloyd rather than *994 Schauman. To that end, Judge Rombro instructed plaintiffs' counsel to provide Rapid with the information available about Lloyd. The judge indicated that he would give Rapid ample time to investigate the matter and prepare for cross-examination. We perceive no abuse in Judge Rombro's exercise of discretion.

V

RAPID'S CHALLENGES TO AWARDS TO GOODMAN AND CIOTTA
The jury awarded Goodman's widow, as personal representative of Goodman's estate, $3,000,000.00 for personal injuries suffered by Goodman. It further awarded Mrs. Goodman $1,000,000.00 for injury to the marital relationship during Goodman's lifetime and $5,000,000.00 for Goodman's wrongful death, making the total award $9,000,000.00. The jury awarded Ciotta $500,000.00 in compensatory damages for personal injuries.
Rapid contends that these awards were "grossly excessive" and "shocked the conscience." It argues that Judge Rombro erred by refusing to reduce the awards or, in the alternative, to grant a new trial. Rapid adds that the judge should have applied the $350,000.00 statutory cap on awards of non-economic damages to the award to Ciotta. See Md. Cts. & Jud. Proc. Code Ann. § 11-108(b) (1995 Repl. Vol; 1997 Cum.Supp.).[58]
In Owens-Illinois v. Zenobia, 325 Md. 420, 601 A.2d 633 (1992), the Court of Appeals rejected a challenge to a $1,200,000.00 award made to a living plaintiff, Zenobia, who suffered from asbestosis. The Court explained:
The granting or denial of a motion for new trial based upon the excessiveness of damages or a motion for remittitur is within the discretion of the trial court. As stated by this Court in Banegura v. Taylor, 312 Md. 609, 624, 541 A.2d 969, 976 (1988), quoting Kirkpatrick v. Zimmerman, 257 Md. 215, 218, 262 A.2d 531, 532 (1970):
"[A]n abuse of that discretion may be reviewed by an appellate court ... but ... `[w]e know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for [a] new trial because of the inadequacy or excessiveness of [compensatory] damages.'"
The plaintiff Zenobia produced medical evidence that showed that his injuries are permanent and progressive. We cannot say that the trial court abused its discretion in refusing to grant Anchor Packing Co.'s motion for new trial or remittitur.
Id. at 449, 601 A.2d 633.
Judge Rombro recognized that all five of the verdicts returned below were high. In refusing to remit the awards, he explained:
[T]he test is not how high the verdicts are. The test is whether it shocks the conscience of the Court.

...
The simple fact is that the amounts, having seen what I saw in this case, just do not shock my conscience.
It is significant to note that, in Abate I, the jury awarded total compensatory damages of: more than $2,500,000.00 to the estate and surviving spouse of a mesothelioma victim; nearly $2,000,000.00 to an asbestosis sufferer; and nearly $1,500,000.00 to the estate of a plaintiff who died of asbestosis. In MCIC, Inc. v. Zenobia, 86 Md.App. 456, 461-62, 481-84, 587 A.2d 531 (1991), vacated on other grounds, 325 Md. 420, 601 A.2d 633 (1992), this Court affirmed a $1,300,000.00 award of *995 compensatory damages to a living plaintiff, Dickerson, who suffered from asbestosis which, apparently, was manifested only by pleural plaques. See also Barry v. Owens-Corning Fiberglas Corp., 282 Ill.App.3d 199, 217 Ill.Dec. 823, 668 N.E.2d 8 (1996) (affirming an award of compensatory damages totalling more than $12,000,000.00 to the family of an insulator who died of mesothelioma at the age of 59).
Goodman's physician and his wife described, in excruciating detail, the 13 operations that Goodman underwent in the 12 months before his death, as well as the unspeakable suffering that he endured. Mrs. Goodman further described her own efforts to clean the open wounds that were left on Mr. Goodman's body after each operation and which never seemed to heal. A "day in the life" video, taken shortly before Goodman's death, was presented to the jury. On this evidence, we are satisfied that neither a remittitur nor an new trial was warranted.
Ciotta testified that he suffered from shortness of breath that rendered him unable to perform household chores or to participate in leisure activities that he had enjoyed, such as dancing and walking a golf course. Dr. David Schwartz, a physician who examined Ciotta and testified as an expert witness, told the court that the shortness of breath was caused by extensive pleural plaques, and that in all probability Ciotta was in the early stages of asbestosis. The doctor testified that the condition was permanent, incurable, and irreversible. Again, we are satisfied that neither a remittitur nor a new trial was warranted.
We are nevertheless convinced that the award to Ciotta must be reduced to $350,000.00. Section 11-108 of the Courts Article provides, in pertinent part:

...
(b) Limitation on amount of damages established.(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.
(2) ... [I]n any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

...
(d) Jury trials.(1) In a jury trial, the jury may not be informed of the limitation established under subsection (b) of this section.
(2)(i) If the jury awards an amount for noneconomic damages that exceeds the limitation established under subsection (b) of this section, the court shall reduce the amount to conform to the limitation.

...
The parties do not dispute that the award to Ciotta was for noneconomic damages. Rapid posits that Ciotta's cause of action arose between July 1,1986, when the $350,000.00 cap became effective, and October 1, 1994, when the cap was raised to $500,000.00. It contends that Judge Rombro "should have reduced the Ciotta verdict to conform to the $350,000 statutory cap ... given Mr. Ciotta's normal chest x-ray in 1967 ..., the absence of even subjective shortness of breath until 1990 ..., and the initial discovery of pleural plaques in 1992...." (Citations to record extract omitted.)
In Owens-Illinois, Inc. v. Armstrong, 326 Md. 107, 121-22, 604 A.2d 47, cert. denied, 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992), the Court of Appeals explained that
a cause of action in negligence or strict liability arises "when facts exist to support each element." ... In a negligence claim, the fact or injury would seemingly be the last element to come into existence. The breach, duty, and causation elements naturally precede the fact of injury. Likewise in a strict liability claim, the existence of the defective product and the causal connection will precede the resultant injury.
The Court recognized: "Unfortunately, identifying the time at which an asbestos-related injury came into existence is usually not a simple task. Due to the latent nature of asbestos-related disease, experts and courts *996 alike have had difficulty in pinpointing its onset." Id. at 122, 604 A.2d 47. In Grimshaw, 115 Md.App. at 163, 692 A.2d 5, we clarified that
a cause of action arises in an asbestos-related injury claim for purposes of determining the applicability of C.J. § 11-108 when each of the elements of the claim are met. In Maryland, the injury element of a negligence claim is satisfied when a wrongful act is coupled with some harm.... [A] cause of action in an asbestos-related injury claim does not arise until the asbestos fibers inhaled into the lungs cause functional impairment.

(Citations omitted; emphasis added.) We elaborated: "Mere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone is not a functional impairment or harm, and therefore, do not constitute a legally compensable injury." Id. at 159, 692 A.2d 5. We explained: "Mere exposure to asbestos fibers does not always result in asbestos-related disease even when the individual's body undergoes cellular changes." Id. at 157, 692 A.2d 5.
Ciotta alleged that his exposure to asbestos on a regular basis began in 1950. Dr. Schwartz characterized Ciotta's pleural plaques as "pleural disease" and testified that pleural disease "normally occurs between 10 and 15 years after first exposure to asbestos...." According to Dr. Schwartz, then, Ciotta's condition could have manifested itself as early as 1960. There was no evidence, however, that Ciotta experienced any functional impairment as a result of that condition until 1990. Ciotta testified that it was then that he began experiencing the shortness of breath that curtailed his normal activities. Thus, it was not until 1990 that Ciotta's cause of action arose. As 1990 fell squarely within the period of time contemplated by § 11-108(b)(1), Ciotta's award was subject to the $350,000.00 cap.

VI

HAMPSHIRE'S CHALLENGE TO JURY INSTRUCTIONS ON DUTIES OF NONMANUFACTURING SUPPLIERS AND INSTALLERS
Hampshire contends that Judge Rombro erred in instructing the jury on the duties of nonmanufacturers, and that the jury's finding that it was negligent was based on the erroneous instructions. Hampshire points out that, unlike a manufacturer of asbestos-containing products, "a non-manufacturing contractor is not held to the state of [the] art knowledge published ... in ... medical and scientific publications, but instead bears a lesser burden of knowledge based on what it should have known given its peculiar business activities." It asserts that it "struggled futilely to obtain jury instructions that would give the jury any bench marks by which to evaluate the distinct degree of knowledge applicable to a contractor" such as itself. Hampshire complains that the trial court refused to give any such instruction and instead "combined into a single blended mass all businesses that were not manufacturers," thus "usurp[ing] the jury's fact-finding on this critical issue" and leaving the jury "with the impression that every nonmanufacturer has the same duty to undertake research on the potential hazards of every product that it buys and uses in its work."[59]
Hampshire's argument rests on the premise that "its work as an interior finishing contractor using materials in the construction of buildings places it outside of any of the trial court's identified categories of conduct, i.e. installer, supplier, or distributor." We fail to see the distinction. Hampshire's own 1961 brochure indicated that Hampshire "serve[d] thousands of customers in seven *997 states and the District of Columbia from its Baltimore headquarters and five branches Washington, DC, Richmond, Norfolk and Roanoke, Virginia, and Charleston, West Virginia." The testimony of former Hampshire employee Eston Bonner made clear that, while Hampshire performed various other functions, it was a major applicator of asbestos-containing fireproofing spray. Bonner testified that he worked for Hampshire from the 1950s into the 1970s, and that he alone did "hundreds" of spray jobs for Hampshire in "school after school after school," as well as in various other buildings. Hampshire normally purchased the spray product and took it to the job site. Another employee, Virgilio Guglielmi, testified that he worked for Hampshire for 30 years beginning in the mid 1950s, and that for the first ten years he did mostly spraying. David Moyer, a Hampshire vice president, testified that the cost of the spray product was factored into the bid for each job.
By common parlance, a "supplier" is "[a]ny person engaged in the business of making a consumer product directly or indirectly available to consumers...." Black's Law Dictionary 1439 (6th ed.1990). An "installer" is "one that installs," such as an installer "of new equipment." Webster's Third New International Dictionary 1171 (1981). The evidence established without question that Hampshire supplied and installed asbestos-containing spray. It was not necessary for the judge to instruct the jury on the duties of contractors who were not suppliers or installers. See generally Md. Rule 2-520; Mallard v. Earl, 106 Md.App. 449, 469, 665 A.2d 287 (1995) ("When requested by a party, the court has a duty to instruct the jury on that party's theory of the case, provided the proposed instruction is supported by the facts and is not otherwise adequately covered by the instructions").
The record reflects, in any event, that Judge Rombro adequately instructed the jury on the various duties of all non-manufacturers. In Balbos, 326 Md. at 198-99, 604 A.2d 445, the Court of Appeals explained that under the Restatement (Second) of Torts:
[M]anufacturers and nonmanufacturing suppliers of products are held to different standards of "knowing" whether their products are dangerous or defective. In order to hold a retailer or other nonmanufacturing supplier liable on a negligence theory, a plaintiff must prove that the supplier knew or had "reason to know" of the danger of the product. See Restatement (Second) of Torts §§ 388(a), 399, 401 & comment a, 402.... A nonmanufacturer, on the other hand, may be held liable when it "should recognize" that the product creates an unreasonable risk of physical harm. See ... Restatement (Second) of Torts § 395 & comment e. In the Restatement, "reason to know" and "should know" are terms of art:
"(1) The words `reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.
"(2) The words `should know' are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists."
Id. § 12, see also id. § 401 comment a, § 402 comments d & e.
(Citations omitted.) The Balbos Court elaborated that, under the Restatement and the common law of Maryland,
when a seller or other nonmanufacturing supplier is nothing more than a conduit between a manufacturer and a customer, the retailer ordinarily has no duty in negligence to discover the defects or dangers of a particular product.... Absent statutory modification, a "conduit" supplier is held to the "reason to know" standard of §§ 12, 388(a) and 401 of the Second Restatement.
The nonmanufacturing supplier, however, may do something more than merely act as a conduit of goods, and those additional acts may impose a higher standard *998 of care upon the supplier.... In many cases, retailer-installers have been held to a duty to inspect or test a product, although the standard of care is not necessarily as high as that imposed on a manufacturer....
Id. at 202-03, 604 A.2d 445 (citations omitted). The Court explained that the "standard considers what reasonably should have been discovered in light of the supplier's peculiar opportunity and competence as a dealer in the particular type of chattel." Id. at 203-04, 604 A.2d 445. Thus, the supplier/installer is held to the "should have known" standard. Id. at 199-200, 604 A.2d 445. The Court concluded that, in the case before it, the evidence reflected that "there was information available in nonobscure publications... sufficient to put an installer-supplier on notice of the danger." Id. at 204, 604 A.2d 445. It held that the supplier/installer therefore had a duty to warn of the dangers posed by its product. Id.
Pursuant to Balbos, Judge Rombro instructed the jury, in pertinent part, as follows:
Under both the plaintiffs' claims, either negligence or strict liability, the manufacturer of a product is held to the knowledge and skill of an expert.
The manufacturer's status as an expert is such that, at a minimum, the manufacturer must keep reasonably abreast of available scientific knowledge and discoveries and advances involving its product and is presumed to know the then current state of the knowledge.
The manufacturer has a duty to test and inspect its products commensurate with the dangers that the manufacturer knows or should have known are involved.
Judge Rombro went on to define negligence, strict liability, and various terms of art. He then elaborated:
A manufacturer is held to the exercise of ordinary care in his particular field of endeavor for those dangers which give him actual knowledge or those of which he should have known through the exercise of reasonable care.
While there is no liability for injuries resulting from exposure to asbestos-containing products when the level of scientific or medical knowledge in existence at a time does not recognize the product's harmful effects to persons using or working around the product, there may be liability if a manufacturer has actual notice of the danger of its products.
Now, a manufacturer is not required to warn against dangers which it did not know nor should not have had reason to know, but it is under a duty to warn of dangers of its asbestos-containing products if it does know or should have known that its products were likely to be dangerous for their reasonably foreseeable use.

...
The duty of the nonmanufacturing supplier to [warn] plaintiffs is different under some circumstances than the duty of a manufacturer to provide warnings.
In general, the supplier/installer [is] not held to a standard as strict as that imposed on the manufacturer.
If, however, you find that the plaintiffs' claim against a supplier/installer is based upon claimed exposure to the installation or application of asbestos-containing product by the defendant, then the installer/supplier does have a duty to warn the plaintiff of the dangers of which the installer/supplier actually was then aware, or which it should have discovered in the light of its particular skill, knowledge or expertise gained in the course of handling or installing products of this type,
When a seller or other nonmanufacturing supplier is nothing more than a conduit between a manufacturer and a customer, the retailer or supplier ordinarily has no duty in negligence to discover the defects or dangers of a particular product.
However, the installing supplier may do something more than merely act as a conduit of the goods, and those additional acts may impose a higher standard of care.
If you find that the installer/supplier not only supplied asbestos products to various jobsites, but also that its employees installed those products, and if you further find the installation created dangers to other *999 workers, that may impose upon such installer/supplier a duty to discover that the products were dangerous by reading the literature that was available at that time.
You may consider what reasonably should have been discovered in the light of the installer/supplier's peculiar opportunity and competence as a dealer in the particular product.
Under such circumstances you may consider whether these installers/suppliers fail to take reasonable care to keep abreast of nonobscure literature on asbestos and whether there was ... sufficient evidence to find that a reasonable familiarity with the product would have included awareness of the dangers.
With these instructions, Judge Rombro made clear that the jury was to determine whether, in light of their particular skills, knowledge, or expertise, certain nonmanufacturing defendants had a duty to discoveror should have known ofthe dangers of their products by familiarizing themselves with nonobscure literature.[60] It was not necessary for the judge to provide further instructionit was for the jury to determine whether a particular defendant had the enhanced duty. Hampshire was free to argue in closing that, for whatever reasons it deemed pertinent, it should not be held to a greater standard.[61]

VII

HAMPSHIRE'S CHALLENGE TO JURY INSTRUCTIONS ON STRICT LIABILITY
Maryland has adopted the theory of strict liability in tort set forth in the Restatement (Second) of Torts § 402A (1965). See Zenobia, 325 Md. at 432, 601 A.2d 633; Phipps v. General Motors Corp., 278 Md. 337, 344, 363 A.2d 955 (1976). The Restatement provides:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
A product may be defective because of a failure to give an adequate warning. See § 402A, Comment j. "`[T]he seller is required to give a warning against [the danger], if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the ... danger.'" Zenobia, 325 Md. at 433, 601 A.2d 633 (quoting § 402A, Comment j. at 353).
Hampshire maintains that § 402A is not applicable "where the predominant purpose of the Defendant's conduct was provision of a service, rather than the sale of goods." There is no dispute that the application of fireproofing spray by Hampshire involved, to some degree, the provision of a service. Hampshire thus contends that Judge Rombro erred by refusing to submit the following proposed instruction to the jury:
Strict liability does not apply where the predominant purpose of the Defendant's conduct was provision of a service, rather than the sale of goods. If you find that the predominant purpose of the Defendant *1000 Contractor's work in which it used any asbestos-containing building material was provision of a service, rather than the sale of goods, then you must find in favor of the Defendant Contractor as to the plaintiff's claims based on strict liability.
Hampshire concludes that, if properly instructed, the jury could only have determined that Hampshire's predominant purpose was the provision of a service.
The predominant purpose test was adopted in Maryland to determine whether a transaction is a sale, such that it is governed by Article 2 of the Uniform Commercial Code, or a service. See Anthony Pools v. Sheehan, 295 Md. 285, 291, 455 A.2d 434 (1983). In arguing that the test applies to actions for strict liability in tort as well, Hampshire relies primarily on Roberts v. Suburban Hospital Assoc., Inc., 73 Md.App. 1, 532 A.2d 1081 (1987), and Miles Lab., Inc., Cutter Lab. Div. v. Doe, 315 Md. 704, 556 A.2d 1107 (1989). While neither case is precisely on point, both provide some guidance.
In Roberts, 73 Md.App. 1, 532 A.2d 1081, this Court was asked to determine whether a trial court properly dismissed claims for strict liability and breach of the implied warranties of merchantability and fitness that were brought against a hospital by a patient who had contracted AIDS from a transfusion.[62]See Md. Com. Law Code Ann. §§ 2-314315 (1997 Repl.Vol.). We noted that "[n]either the implied warranties nor the notion of strict liability has been applied in Maryland to a transaction that is predominantly one of providing services." 73 Md. App. at 8, 532 A.2d 1081. We further observed that, when the transfusion took place, a statute was in effect that exempted all those involved in obtaining, processing, storing, distributing, or using whole blood or blood products for injection or transfusion from liability for serum hepatitis under theories of strict liability or breach of the implied warranties. Id. at 9, 532 A.2d 1081 (quoting Md. Health-Gen. Code Ann. § 18-402 (1982)). After the transfusion took place, the legislature amended the statute to state that those involved in the aforementioned activities are performing a service and are not subject to strict liability or the implied warranties, regardless of the disease contracted. Id. at 8, 532 A.2d 1081 (quoting Md. Health-Gen. Code Ann. § 18-402 (1987 Repl.Vol.)). We explained:
A transfusion is not just a sale of blood that the patient takes home in a package. The transfusion of the bloodinjecting it into the patient's bloodstreamis what he really needs and pays for, and that involves the application of medical skill. It would be artificial at best, and probably inaccurate, to conclude as a matter of law that the product predominates over the service.
Id. at 15, 532 A.2d 1081. We concluded that both the warranty count and the strict liability count "arose from the provision of a servicei.e., the rendering of health carerather than the sale of a product." Id. at 16, 532 A.2d 1081.[63]
*1001 Subsequently, in Miles Lab., 315 Md. 704, 556 A.2d 1107, the Court of Appeals determined that a sale of blood by a commercial supplier of a blood clotting factor concentrate, which resulted in transmission of the AIDS virus to the ultimate user, did not fall within the exemption set forth in the version of § 18-402 that was in effect in 1983, when the sale took place. The commercial supplier was therefore not statutorily exempted from liability. The Court further determined that under the common law the supplier was clearly engaged in selling a product rather than providing a service, whether "the `gravamen test' ... or the `predominant purpose test'" was applied.[64] 315 Md. at 724-25, 556 A.2d 1107. It nevertheless concluded that strict liability was inapplicable and that the implied warranties did not apply because, at the time in question, the product was "unavoidably unsafe." Id. at 732, 739, 556 A.2d 1107.
The difficulty in determining whether strict liability can apply to a particular "sales-service hybrid transaction" is widely recognized. W. Page Keeton et. al., Prosser and Keeton on Torts § 104, at 720 (5th ed.1984).
There are three primary factors that courts have utilized in deciding whether or not to impose strict liability on the defendant who causes harm in the course of using a defective product. These are: (1) the nature of the defendant's activity; (2) whether the defective product was transmitted by the defendant in the course of rendering a service or only used; (3) whether the service of the defendant or the product transmitted was the principal thing bargained for.
Id. Courts in other jurisdictions have placed particular emphasis on the third factor, refusing to apply the doctrine of strict liability where the service was the predominant factor. See Scordino v. Hopeman Bros., Inc., 662 So.2d 640, 645 (Miss.1995) (affirming directed verdict in favor of subcontractor that supplied and installed asbestos-containing panels on ship, and stating that "a contractor/subcontractor is not a seller, within the scope of Section 402A of Restatement (Second) of Torts, and is therefore not liable for any component parts it may supply in compliance with the performance of a job or service"); Maack v. Resource Design & Constr., Inc., 875 P.2d 570, 581 (Utah App.1994) (affirming summary judgment on strict liability count in favor of contractor who installed stucco and other exterior components of residence, and explaining that, although contractor included costs of materials in bill, the undisputed evidence established that contractor "simply utilized these component parts when constructing the residence[it was] not in the business of selling stucco, adhesives, *1002 or membranes in a wholesale or retail business"); Monte Vista Dev. Corp. v. Superior Court of Fresno County, 226 Cal.App.3d 1681, 1687, 277 Cal.Rptr. 608 (1991) (affirming summary judgment in favor of tile subcontractor on strict liability count, and explaining that subcontractor not strictly liable to homeowner for defective soap dish it supplied and installed because it "was not in the business of selling soap dishes or any other fixtures" and "it mattered not to [the subcontractor] whether [the developer] or someone else supplied the tiles"); Delta Refining Co. v. Procon, Inc., 552 S.W.2d 387 (Tenn.Ct. App.1976) (affirming directed verdict on strict liability count in favor of contractor that installed defective pump at oil refinery, on ground that contractor "was not in the business of selling such pumps"). See also Chenango Ind. Dev. Agency v. Lockwood Greene Eng'rs, Inc., 114 A.D.2d 728, 494 N.Y.S.2d 832, 834 (1985) (affirming dismissal of strict liability count against roofer that installed defective roofing material, and explaining that roofer "was engaged primarily to install [the] material and that any transfer of personal property was purely incidental to the performance of this service"), appeals dismissed, 67 N.Y.2d 757, 500 N.Y.S.2d 1027, 490 N.E.2d 1233 (1986); Compare Brannon v. Southern Illinois Hosp. Corp., 69 Ill. App.3d 1, 25 Ill.Dec. 462, 386 N.E.2d 1126 (1978) (strict liability judgment affirmed against contractor who was hired to supply, assemble, and install a dumbwaiter in a hospital and who altered the device, thus causing the defect, after receiving it from the manufacturer).
In light of this State's case law and case law from other jurisdictions, there can be no doubt that a party to a hybrid transaction cannot be held strictly liable in tort if the predominant purpose of that transaction was a service rather than a sale. We do not agree with Hampshire's contention that, given proper instructions, the jury could only have concluded that its predominant purpose was the provision of a service. In light of the ample testimony, recounted supra, that Hampshire employees delivered the fireproofing spray to the job sites, that the cost of the spray was included in Hampshire's bids for each job, and that Hampshire was a major applicator of the spray, we are convinced that, even if properly instructed, the jury could have properly concluded that the predominant purpose of the contract was the sale of fireproofing spray. We do agree, however, that the jury should have been instructed as to the matter so that it could make a proper determination.
In instructing the jury, Judge Rombro reiterated the requirements of § 402A. He stated, in pertinent part:
In order to recover under this claim of strict liability, each plaintiff must prove by a preponderance of the evidence each of the following elements as to each defendant:
One, that the defendant manufacturer, seller, distributor and/or installer is engaged in the business of selling the product which caused the injury claimed, engaged in the business of selling.[65]
While this instruction was accurate, it was not complete. It did not inform the jury that a contractor will not be strictly liable if its predominant purpose was the provision of a service rather than a sale. Judge Rombro erred by refusing to supplement the instruction with the instruction requested by Hampshire. See Md. Rule 2-520; Mallard, 106 Md.App. at 469, 665 A.2d 287.

CONCLUSION
We summarize the various determinations discussed throughout this lengthy opinion.
As to the arguments set forth in the joint briefs of the parties, we conclude that:
- the consolidated trial below did not confuse or overwhelm the jury,
- the appellants were not denied their right to a fair and impartial jury, but
- the starting dates of liability set forth on several of the common issue verdict sheets are inaccurate and, upon remand, the starting dates as to Stebbing and Hampshire *1003 must be reformed to conform with the evidence.
As to the arguments set forth in the individual briefs, we conclude that:
- the evidence was insufficient to support the judgments against U.S. Mineral,
- the evidence was insufficient to support the judgments against Stebbing,
- the evidence was insufficient to support the judgments in favor of Goodman and Morrow against Hampshire,
- the judgment in favor of Ciotta must be reduced in conformance with Md. Cts. & Jud. Proc.Code Ann. § 11-108(b) (1995 Repl.Vol.; 1997 Cum.Supp.),
- Judge Rombro erred in refusing to give Hampshire's requested jury instruction to the effect that strict liability does not apply where the predominant purpose of the defendant's conduct was provision of a service rather than the sale of goods.
We therefore vacate the verdicts as to Stebbing and Hampshire that are set forth on the common issue verdict sheets and remand the case to the trial court to reform the starting dates of liability on those verdict sheets. We reverse the judgments as to: Goodman, Theis, Glensky, and Morrow against U.S. Mineral; Theis and Glensky against Stebbing; and Goodman and Morrow against Hampshire. We vacate the judgment as to Ciotta and remand to the trial court to reduce the judgment in conformance with the statute. We further vacate the judgments as to Theis and Glensky against Hampshire and remand to the trial court for further proceedings. Upon remand, the trial court must adjust the judgment shares as necessary.
VERDICTS AS TO STEBBING AND HAMPSHIRE ON COMMON ISSUE VERDICT SHEETS VACATED AND REMANDED WITH INSTRUCTIONS TO REFORM STARTING DATES OF LIABILITY IN ACCORDANCE WITH THIS OPINION.
JUDGMENTS AS TO GOODMAN, THEIS, GLENSKY, AND MORROW AGAINST U.S. MINERAL REVERSED; JUDGMENTS AS TO THEIS AND GLENSKY AGAINST STEBBING REVERSED; JUDGMENTS AS TO GOODMAN AND MORROW AGAINST HAMPSHIRE REVERSED.
JUDGMENT AS TO CIOTTA VACATED AND REMANDED WITH INSTRUCTIONS TO REDUCE JUDGMENT IN ACCORDANCE WITH THIS OPINION.
JUDGMENTS AS TO THEIS AND GLENSKY AGAINST HAMPSHIRE VACATED AND REMANDED FOR FURTHER PROCEEDINGS IN LIGHT OF OUR HOLDING AS TO THE PROPRIETY OF AN INSTRUCTION ON THE PREDOMINANT PURPOSE TEST.
CIRCUIT COURT FOR BALTIMORE CITY INSTRUCTED TO ADJUST JUDGMENT SHARES ACCORDINGLY.
JUDGMENTS AS TO TRIAL PLAINTIFFS OTHERWISE AFFIRMED.
COSTS TO BE PAID 1/2 BY APPELLANTS AND 1/2 BY APPELLEES.

 Index
 Procedural Background............................................950-953
 Issues ..........................................................954-997
 Joint Arguments..................................................955-976
 I. The Consolidation......................................955-969
 A. Confusion and Prejudice............................ 957-961
 1. Large Number of Defendants, Products, and Claims.957-958
 2. Phasing of Trial.................................958-960
 3. Selection of Trial Plaintiffs ...................960-961
 B. Verdict Sheets......................................961-965

*1004
 C. Erroneous Verdicts................................965-970
 II. Fair and Impartial Jury................................970-976
 A. Dismissals for Hardship.............................970-971
 B. Racial Discrimination...............................971-973
 C. Ex Parte Communication.....................973-976
Summary of Joint Issues..............................................976
Arguments of Individual Appellants..............................977-1002
 III. Sufficiency of the Evidence.............................977-991
 A. Goodman..............................................977-981
 B. Ciotta...............................................981-983
 C. Theis................................................983-987
 D. Glensky .............................................987-989
 E. Morrow...............................................989-991
 IV. Rapids' Allegation of Discovery Violations..............991-994
 V. Rapid's Challenges to Awards to Goodman and Ciotta......994-996
 VI. Hampshire's Challenge to Jury Instructions on Duties of
 Nonmanufacturing Suppliers and Installers..............996-999
 VII. Hampshire's Challenge to Jury Instructions on
 Strict Liability.......................................999-1002
Conclusion ....................................................1002-1003

NOTES
[1] Judge Levin gave those defendants that settled the option of having certain issues regarding their cross-claim liability tried in Abate I. Only two settling defendants chose to remain in that case. See ACandS, Inc. v. Godwin, 340 Md. 334, 344, 667 A.2d 116(1995).
[2] Although those plaintiffs whose cases were tried in full were known as illustrative plaintiffs in Abate I and trial plaintiffs in Abate II, their purposes were the same in both trials"to give the jury a better understanding of the issues involved in an asbestos case." Id. at 343, 667 A.2d 116.
[3] The original plan for Abate II called for ten trial plaintiffs. The case of one of the ten was severed, and the cases of four more were removed to federal court. Judge Rombro then added an additional trial plaintiff, but that plaintiff settled his case prior to trial.
[4] The appellants contend, and the appellees do not dispute, that this number is still uncertain and will be sorted out at the mini-trials.
[5] We refer to the five persons who actually alleged exposure to asbestos products as the "trial plaintiffs," although we note that Goodman died prior to trial and his claim was pursued by his wife as the personal representative of his estate. Morrow died during trial. In addition to the negligence and strict liability claims of the trial plaintiffs, Mrs. Goodman successfully pursued a claim for damages to the marital relationship and a survival action, and the wives of Glensky, Morrow, and Theis brought successful claims, along with their husbands, for damages to their marital relationships.
[6] Seven of the 11 defendants were named by one or more of the trial plaintiffs.
[7] The jury also awarded Goodman and Ciotta punitive damages from Rapid and compensatory and punitive damages from Harbison-Walker Refractories Division of Dresser Industries, Inc. (hereinafter "Harbison-Walker"). As we shall explain infra, the court granted judgments notwithstanding the verdict in favor of the defendants as to those awards.
[8] For example, the jury awarded Glensky $1,100,000.00 in damages. The jury found Crane, U.S. Mineral, Stebbing, and Hampshire liable to Glensky. Other defendants had settled with Glensky. The court thus determined that there were ten joint tortfeasor shares in the amount of $110,000.00 each, and that Crane, U.S. Mineral, Stebbing, and Hampshire were each jointly and severally liable for four shares, or $440,000.00.
[9] Cross and/or third party claims were pursued in both Phase I and Phase II by Pittsburgh Corning Corp. (hereinafter "Pittsburgh Corning"), ACandS, Inc. (hereinafter "ACandS"), Porter Hayden Co. (hereinafter "Porter Hayden"), and Owens-Corning Fiberglas, Inc. (hereinafter "Owens-Corning"). Indemnity claims were pursued in both Phase I and Phase II by Phase I defendants Stebbing, Hampshire, and Lloyd E. Mitchell, Inc.
[10] Judge Rombro also granted U.S. Mineral's motion for new trial in the cases of Morrow, Goodman, Theis, and Glensky on the ground that U.S. Mineral had been unfairly surprised by the testimony of a witness for the plaintiffs. A new trial was scheduled and, in preparation, extensive discovery proceedings were conducted. On the eve of the new trial, however, U.S. Mineral moved to withdraw the motion and to have the judgments reinstated. U.S. Mineral informed Judge Rombro that it could unearth no new evidence to respond to the surprise testimony. It also complained that, at the new trial, the plaintiffs intended to better their positions by calling more witnesses than they had called in the first trial. Judge Rombro granted the motion to withdraw the motion for new trial and reinstated the judgments against U.S. Mineral. U.S. Mineral then noted this appeal. The appellees moved to dismiss the appeal, but a three judge panel of this Court ruled that it could proceed.

In their brief responding to U.S. Mineral's brief on appeal, the appellees renew their motion to dismiss. They contend that the judgments against U.S. Mineral became nullities when Judge Rombro granted the motion for new trial, and that the judge therefore could not have properly reinstated them. They further contend that, even if the judgments did not become nullities, U.S. Mineral should be estopped from appealing since it participated in extensive pre-trial discovery. We reject both contentions.
In Davidson v. Miller, 276 Md. 54, 344 A.2d 422 (1975), after a trial court granted the defendants' motion for new trial in a personal injury case, the court reinstated the verdict and instead granted a new trial unless the plaintiffs agreed to a remittitur. The Court of Appeals upheld the trial court's action upon appeal, explaining: "[W]e hold that ordinarily in a civil proceeding the trial court possesses the power to reconsider and correct any of its rulings, including those of the type here, until a final judgment becomes enrolled." Id. at 85-86, 344 A.2d 422. The decision to grant U.S. Mineral's motion to withdraw its motion for new trialand to thus reinstate the judgmentswas entirely within Judge Rombro's sound discretion. Indeed, Judge Rombro had the discretion to deny the motion but chose not to do so.
By moving to withdraw its motion after learning, through discovery, that it could produce no new evidence, U.S. Mineral acted in the interests of judicial economy. Compare Armour Fertilizer Works v. Brown, 185 Md. 273, 44 A.2d 753 (1945) (where plaintiff obtained default judgment against defendant, defendant had judgment vacated, then case proceeded to trial and defendant prevailed, plaintiff was estopped from appealing the vacation of the default judgment). Under the circumstances, estoppel would be inappropriate.
[11] In its individual brief, Hampshire expresses its belief that the common issue verdicts as to future mini-trial plaintiffs "are apparently not yet ripe for appeal." It explains that its "present appellant focus is thus limited" to the judgments against it and in favor of Goodman, Glensky, Morrow, and Theis. As we have observed, Hampshire nevertheless expressly "adopts the briefs and arguments of all other appellants and the Joint Brief of Appellants to the extent not inconsistent with Hampshire's positions." Hampshire did not participate in oral argument and thus could not be called upon to illuminate the matter further.

Based on this, the appellees urge this Court to "rule that Hampshire has waived any issue relating to common issue verdicts which it unilaterally elected not to brief." We decline to do so. Hampshire is correct in its view that the common issue verdicts as to future plaintiffs are not ripe for appeal. As we shall explain infra, in part I.C., the common issue verdicts are significant to this appeal only to the extent that they have some bearing on the verdicts as to the trial plaintiffs or may reflect some impropriety in the consolidation. Hampshire quite properly retained its right to pursue those arguments contained in the joint brief by adopting the arguments set forth in that brief, to the extent not inconsistent with its position.
[12] Rapid does not now appeal the common issue punitive damages verdict for the actions of its predecessor beginning in 1963 and, in a footnote in their brief responding to Rapid's individual brief, the appellees contend that Rapid has therefore waived its right to appeal the matter. We disagree. The only awards of punitive damages against Rapid were made to Goodman and Ciotta, and Judge Rombro granted Rapid's motion for judgment notwithstanding the verdict as to those awards. As there is no final judgment against Rapid involving punitive damages, the matter is not ripe for review under this Court's April 18, 1996 order.
[13] We shall at times refer to all five appellants as the "joint appellants."
[14] If another plaintiff prevails against U.S. Mineral in a future mini-trial, U.S. Mineral is free to raise this argument again in any resulting appeal. At that time, guidance may be obtained from Eagle-Picher Indus., Inc. v. Balbos, 326 Md. 179, 220-21, 604 A.2d 445 (1992), Lane v. Bethlehem Steel Corp., 107 Md.App. 269, 284, 667 A.2d 962 (1995), and Kennedy v. Mobay, 84 Md.App. 397, 579 A.2d 1191 (1990), aff'd, 325 Md. 385, 601 A.2d 123 (1992). Significantly, the Balbos Court indicated that such an instruction should be given if the "suppliers, at a minimum, ... have introduced evidence that they warned the intermediary of the danger ... or that they knew a warning was unnecessary because the intermediary was already well aware of the danger...." 326 Md. at 220, 604 A.2d 445 (citation omitted).
[15] To the extent they are preserved, Stebbing is free to raise the arguments in any appeal resulting from a judgment against it at a mini-trial.
[16] As Judge Rombro instructed the jury in the instant case, the "state of the art" is the "state of the knowledge" in the "scientific community" about the dangers of asbestos at any given time. See ACandS, Inc. v. Asner, 344 Md. 155, 165, 686 A.2d 250 (1996) (defining "state of the art").
[17] The Godwin Court observed that the United States District Court for the District of Maryland announced, in an unpublished 1983 memorandum, the criteria it would use in consolidating batches of five to eight asbestos cases for full trials. 340 Md. at 401, 667 A.2d 116 (citing In re All Asbestos Cases Pending in the United States District Court for the District of Maryland, No. BML 1, slip op. (unreported) (D.Md. December 16, 1983)). The District Court indicated that, in determining whether certain cases should be consolidated, the following factors would be significant: "(1) common worksite; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether the plaintiffs were living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs were represented by the same counsel; and (8) type of cancer alleged (e.g., lung, colon, mesothelioma)." No. BML 1, slip op. at 3. Although other jurisdictions have adopted these criteria, see, e.g., Malcolm v. National Gypsum Co., 995 F.2d 346 (2d Cir. 1993), the Godwin Court did not expressly do so.
[18] For the sake of expediency we shall hereafter, at times, refer to the combination of cross-plaintiffs and third-party plaintiffs as simply cross-plaintiffs. We shall, at times, refer to the combination of cross-claims and third-party claims as simply cross-claims.
[19] The joint appellants refer us specifically to the testimony of James R. Millette, Ph.D., an expert in the field of environmental science. Dr. Millette testified regarding the friability of asbestos-containing packing materials and indicated that a worker who assisted him with one test involving used packing materials suggested that the materials might have been manufactured by Crane.
[20] Goodman died prior to trial and Morrow died during trial. Goodman's testimony was admitted via videotaped deposition, and Morrow testified before his death.
[21] Any references herein to "Glensky" are to Frederick Glensky only. We shall refer to Robert Glensky by his full name or as "Glensky's father."
[22] For example, as to appellant Stebbing, the jury was given a page of instructions that read, in pertinent part: "Do you find by a preponderance of the evidence that Defendant EL Stebbing & Co., Inc. was negligent in selling, distributing or installing any asbestos-containing products? Indicate your answers on the chart on page 3." The corresponding chart appeared as follows:

 _________________________________________________________________________________
 (a) (b)
 EL STEBBING NEGLIGENT SALE, DATES OF NEGLIGENT
 & CO., INC. DISTRIBUTION OR SALE, DISTRIBUTION
 INSTALLATION OR INSTALLATION,
 IF ANY
 _________________________________________________________________________________
 PRODUCTS YES NO USERS BYSTANDERS
 _________________________________________________________________________________
 Asbestos-Containing
 Spray
 _________________________________________________________________________________
 Asbestos-Containing
 Joint Compounds
 _________________________________________________________________________________
 A second page of instructions read, in pertinent part: "Do you find by a
 preponderance of the evidence that Defendant EL Stebbing & Co., Inc. sold,
 distributed or installed asbestos-containing products that were in a defective
 condition unreasonably dangerous to foreseeable USERS and BYSTANDERS.
 Indicate your answers on the chart on the next page." The corresponding
 chart read:
 ___________________________________________________________________________________
 (a) (b)
 EL STEBBING DEFECTIVE AND DATES DEFECTIVE
 & CO., INC. UNREASONABLY AND UNREASONABLY
 DANGEROUS DANGEROUS ,IF ANY
 ___________________________________________________________________________________
 PRODUCTS YES NO USERS BYSTANDERS
 ___________________________________________________________________________________
 Asbestos-Containing
 Spray
 ___________________________________________________________________________________
 Asbestos-Containing
 Joint Compounds
 ___________________________________________________________________________________

[23] The joint appellants complain that this category should not have been submitted to the jury, as there was no evidence that Rapid or its predecessor "manufactured or distributed any product that could be accurately characterized as `asbestos fiber.'" They assert that the common issue verdicts "for the generic category `asbestos fiber' leave[ ] the door open for plaintiffs in future mini-trials to argue that any Rapid product containing asbestos, however minimal in amount, however encapsulated, however safe in use that particular product may be is defective per se." The appellees clarify, however, that the category "asbestos fiber" refers to raw asbestos. They explain that "Rapid was the only defendant who also mined and distributed asbestos fiber in Maryland, which could in future cases be a source of a plaintiff's disease." The joint appellants do not dispute this assertion and do not offer any citation to the record that would shed light upon the matter. We therefore shall not address the matter further, except to note that, in light of the appellees' explanation, we have considerable doubt that the joint appellants' concerns will materialize at any future mini-trial.
[24] Those product types were: refractory brick with asbestos spacers, asbestos-containing acoustical plastering products, fire retardant asbestos-containing decorative micarta, turbines with asbestos, asbestos-containing blankets, asbestos-containing refractory gunning mix, asbestos-containing castable, asbestos-containing rollboard, boilers with asbestos, marine boilers with asbestos, land-based boilers with asbestos, asbestos-containing millboard, refractory brick with asbestos-containing strips, asbestos-containing cloth, asbestos-containing plastering products, asbestos-containing micarta, asbestos-containing marinite, asbestos-containing micarta/marinite panels, asbestos-containing marine veneer, asbestos-containing paper, asbestos-containing rings, asbestos-containing inserts, vermiculite spray with tremolite, and asbestos-containing plaster.
[25] As we shall discuss infra, Glensky's claims against the appellants depended, in large part, on Theis's testimony.
[26] The joint appellants point out that another defendant, Asbestospray Corporation (hereinafter "Asbestospray"), was found liable for "asbestos-containing spray," but the evidence established that sprays produced by Asbestospray contained anywhere from ten-percent to 80-percent asbestos. Asbestospray is not a party to this appeal and any argument as to that company's verdict sheets is not properly before this Court, except to the extent that the argument suggests that the verdict sheets impacted upon the trial plaintiffs' verdicts.
[27] We do not suggest that there is no chance that a specific product exists that cannot possibly emit respirable asbestos fibers but which is nevertheless included in a product category that has been found to be defective. We merely indicate that we know of no such product and that the appellants have not directed us to any evidence in the record regarding any such product. It does not appear that any such product is implicated in this appeal.
[28] We recognize, as the joint appellants' urge, that "all asbestos-containing products cannot be lumped together in determining their dangerousness." Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1145 (5th Cir.1985) (explaining that a manufacturer of a non-friable asbestos-containing product could not be expected to know of the product's dangerous nature, and thus have a duty to warn, based on knowledge about the dangerous nature of friable asbestos-containing products). It cannot be disputed that "`different manufacturers' asbestos products differ in degrees of harmfulness.'" Robertson v. Allied Signal, Inc., 914 F.2d 360, 379-80 (3d Cir. 1990) (refusing to impose market-share liability in asbestos case) (citation omitted). We are nevertheless satisfied that where evidence is presented to the effect that exposure to visible dust from any asbestos-containing product constitutes exposure to an excessive amount of asbestos, and that evidence is not controverted, asbestos-containing products that create visible dust may be "lumped together." Compare Becker v. Baron Bros., 138 N.J. 145, 649 A.2d 613, 620 (1994) (where conflicting proof was presented as to the dangers of asbestos-containing products, it was error to instruct the jury that all asbestos-containing brake products were defective as a matter of law).
[29] The parties tacitly agree that the trial plaintiffs established exposure only to Hampshire's asbestos-containing spray and not to its asbestos-containing joint compound. Hampshire's liability for joint compound in general was clearly before the jury, however. We therefore conclude that the dates of liability for the joint compound are ripe for review. See generally Md. Rule 8-131(a).
[30] As we have observed, the joint appellants allege error in the date that Asbestospray's successor liability began rather than the starting date for Asbestospray's liability for its own actions. Asbestospray was incorporated in 1949. It is apparent that the jury concluded that Asbestospray's predecessor was in business in 1939.
[31] In its individual brief, Stebbing contends that the 1947 starting date for liability for its asbestos-containing joint compound should also be reformed since the evidence indicated that joint compounds were not in use until sometime in the 1960s. In fact, there was evidence that Stebbing began using dry wall, which requires joint compound, "after 1950." Because there was no evidence that Stebbing was using joint compound in 1947, we instruct the trial court to reform that date as well. Stebbing argues, moreover, that the ending dates of liability for both asbestos-containing sprays and asbestos-containing joint compounds should be reformed to comport with the dates when Stebbing stopped using the products. For the reasons explained in the subsection that follows regarding Rapid's successor liability for Philip Carey Manufacturing Company products, we deem it apparent that the jury properly concluded that Stebbing had a duty to warn that continued after it stopped using the products.
[32] We calculate the requested revisions to be to 71-percent of the verdicts concerning Harbison-Walker.
[33] Although Judge Rombro granted judgment notwithstanding the verdict in favor of Westinghouse and partial judgment notwithstanding the verdict in favor of Rapid as to the punitive damages findings against them, the joint appellants do not include those findings in their list of jury errors indicating confusion.
[34] As the appellants point out in their reply brief, the plaintiffs used their challenges for cause and peremptory strikes to strike all but one of these prospective jurors. The remaining juror was seated as an alternate but was dismissed before deliberations began.
[35] The remaining white man was seated as an alternate but was dismissed before deliberations began.
[36] Judge Rombro informed counsel that the other clerk was on leave and would not return to work for several weeks. He agreed to question that court clerk when she returned, and instructed counsel to remind him to do so. Apparently, the questioning was never conducted. It is not clear whether defense counsel reminded the court of the matter at an appropriate time.
[37] The joint appellants contend that the plaintiffs improperly bolstered the qualifications of two expert witnesses, Dr. John Dement and Dr. Barry Castleman, by describing them on the papers as experts in "state of the art" when they were not accepted by the court as such. The appellants are urging a distinction without a difference. Judge Rombro found that Dr. Dement was an expert in "the field of industrial hygiene, epidemiology, and the history of knowledge of hazards of asbestos through industrial hygiene." He found that Dr. Castleman was an expert "in the fields of occupational health and health hazards of asbestos and the history of asbestos." The plaintiffs' shorthand notation that the witnesses were experts in the state of the artthe state of the knowledge in the scientific community about the dangers of asbestos at any given timewas entirely accurate.
[38] The joint appellants do not argue in this appeal that Judge Rombro should have interrogated a juror about the photographs. Such an argument would be unfounded, as the judge offered below to conduct such an interrogation but defense counsel rejected the offer unless the judge agreed to interrogate an alternate juror and to discharge the juror after the questioning.
[39] The joint appellants direct us to three out-of-state cases. See United States v. Harry Barfield Co., 359 F.2d 120, 124 (5th Cir.1966); Gall v. New York & New Brunswick Auto Express Co., 132 N.J.L. 466, 40 A.2d 643 (E. & A. 1945); Baker v. Ohio Ferro-Alloys Corp., 23 Ohio App.2d 25, 261 N.E.2d 157, 164 (1970). All three cases involved actual conversations between trial counsel or parties and jurors. Not one suggested that an inflexible, automatic rule of reversal would always apply in any situation involving improper contact with a juror.
[40] The appellants do not dispute that exposure to asbestos was the cause of all of the trial plaintiffs' illnesses.
[41] Lloyd acknowledged that, at a prior deposition, he had failed to identify Carey products. He explained that the lawyers at the deposition "were all throwing questions" at him and surmised: "I probably couldn't think of it at the time.... I guess I must have missed a lot of stuff."
[42] There is no suggestion that Goodman or any other trial plaintiff ever removed dried asbestos-containing spray from pipes.
[43] We are not persuaded by the plaintiffs' contention that Bonner also indicated that he sprayed CAFCO at Standard Oil during that time period. After Bonner indicated that he used Spraycraft, he went on to testify that Standard Oil employees were present during the spraying. The following then transpired:

Q Did you seewhat if anything did you see in the air around the [Standard Oil] employees?
...
A Well, the Exxon employees were walking throughout the site and anybody that walked throughout the site from the architect to whoever came on the site had to breathe dust. It is just the nature of the product.
It is not anything thatthat you can hide or anything like that. It is just there.
...
Q You say it is the nature of the product that you can't hide the dust.
What product are you talking about?
A Talking about Cafco, Spraycraft.
Contrary to the plaintiffs' suggestion, a reasonable jury could not infer from this that Bonner was now saying that he sprayed CAFCO at Standard Oil from 1957 through 1960. The witness was merely explaining that fireproofing spray in general created dust that could not be hidden.
[44] Although Hampshire was also found negligent and strictly liable on the common issue verdict sheets for joint compound, the parties tacitly agree that the verdicts regarding the four trial plaintiffs who prevailed against Hampshire Goodman, Theis, Glensky, and Morrowreflect only exposures to fireproofing spray applied by Hampshire. The parties apparently agree that no evidence was presented regarding exposure of those plaintiffs to joint compound.
[45] In Armstrong, 87 Md.App. at 733, 591 A.2d 544, we explained:

Pleural plaques and pleural thickening result from the scarring of the pleura, the thin membrane that keeps the lungs contained and configured to the chest wall and diaphragm. When asbestos fibers are inhaled into the lungs, they may pierce through the smallest airways into the pleura. The fibers that reach the pleura cause a localized reaction which results in a deposit of scar tissue. When the scarring of the pleura is localized, it is known simply as a pleural plaque. When the scarring is widespread, it is referred to as pleural thickening.
[46] Crane does not challenge the dates of exposure found by the jury, although the parties apparently agree that the only relevant time period is 1962 through 1967, when Theis was working for Mitchell.
[47] Crane makes this argument as to plaintiffs Glensky and Morrow as well. The argument fails as to those plaintiffs for the same reasons that it fails as to Theis.
[48] Crane contends that this Court should not consider Dr. Millette's testimony in evaluating the sufficiency of the evidence because, in Crane's view, Judge Rombro erred in permitting the plaintiffs to adopt the testimony. Crane argues that, by permitting the plaintiffs to adopt the testimony. Judge Rombro improperly relieved them of their burden of proof. We do not agree. The plaintiffs did not seek to adopt Dr. Millette's testimony as an afterthought after they had closed their case and the doctor had testified for the cross-plaintiffs. Before resting their case, the plaintiffs expressly "reserved the right" to reopen their case to adopt Dr. Millette's testimony when it was presented. Counsel for the plaintiffs stated that, if Judge Rombro would not allow the plaintiffs to adopt Dr. Millette's testimony for the cross-plaintiffs, the plaintiffs would call the doctor to the stand themselves during their own case. Judge Rombro did allow the adoption of the testimony and, in light of judicial economy considerations and the judge's ability to assess the conduct of the trial, we perceive no abuse of discretion. Md. Rule 5-611(a) makes clear that a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time...."
[49] Crane contends that it inadvertently failed to respond to a discovery request to turn over any such plant monitoring reports, and that Judge Rombro admitted the reports as a sanction for that inadvertent violation. Crane argues that the reports were irrelevant and prejudicial, and that Judge Rombro therefore abused his discretion by imposing the sanction. In fact, Judge Rombro made clear that he accepted the plaintiffs' proffer that certain manufacturing processes studied at the plant mirrored work performed by workers in the field, and that the results of the studies were therefore relevant to the plaintiffs' cases. See Cole v. Sullivan, 110 Md.App. 79, 89, 676 A.2d 85 (1996) ("[A] trial court has wide discretion in admitting or denying the admission of evidence ... "). The judge informed counsel that he was admitting the evidence because it was proper rebuttal evidence. He added:

... I recognize that it may cause some difficulty as far as the defendant is concerned, but the documents should have been here, should have been here at the beginning of the case. And one side or the other has to have a problem. I think it is the one who caused the problem who should have it.
Crane also complains that the reports were admitted into evidence without foundation or explanation. In objecting below to the introduction of the reports, counsel for Crane expressly argued that the reports were irrelevant. He did not argue that there was an inadequate foundation for their admission. See generally Klein v. Weiss, 284 Md. 36, 55, 395 A.2d 126 (1978) (where plaintiff's "objections were specifically based on relevancy grounds, he is thereby limited in his claim of error on appeal and ordinarily is deemed to have waived other grounds not mentioned"). In any event, a review of the record reveals that the jury was made aware that the reports were those conducted at the Crane manufacturing plant, as described by McGillop. Counsel for the plaintiffs offered a brief explanation as to each test depicted in the reports as it was published to the jury.
[50] As in the case of Hampshire, the parties tacitly agree that the verdict sheets regarding the trial plaintiffs who prevailed against StebbingTheis and Glenskyconcerned only Stebbing's application of fireproofing spray and not its use of joint compound. Apparently, the parties agree that there was no evidence suggesting that either plaintiff was ever exposed to joint compound applied by Stebbing.
[51] There was no suggestion that the dust had not settled by that time and, in any event, it would appear that any such suggestion would call into play the so-called "fiber drift theory" which the Court of Appeals expressly rejected in Balbos, 326 Md. at 216-17, 604 A.2d 445.
[52] Crane suggests that the starting date of exposure selected by the jury1962was erroneous in that Glensky did not begin assisting his father at work until he was in high school and did not begin working as an apprentice steamfitter until 1970, shortly after he graduated from high school. Crane contends that "[n]o evidence was introduced regarding household exposure to John Crane packing." Our recitation of the evidence presented on Glensky's behalf makes clear that this contention is erroneous. Crane does not comment upon the jury's selection of 1980 as the ending date of Glensky's exposure.
[53] As an incidental matter, we note that U.S. Mineral suggests that this testimony was ambiguous, in that Theis stated that Robert Glensky was in "the" boiler room with him while Hampshire was spraying, but did not specify which boiler room. U.S. Mineral suggests it could have been the boiler room at City Hospitals or some other place rather than Murphy Homes. This assertion ignores that Theis testified that he was exposed to spraying at Murphy Homes and City Hospitals, that he recalled that it was Hampshire that sprayed at Murphy Homes, and that he could not recall who sprayed at City Hospitals.
[54] The plaintiffs assert that Crane has waived this argument by failing to make it below when moving for judgment. We have reviewed Crane's motions and are satisfied that the arguments made therein were sufficient to preserve the matter for appeal.
[55] No explanation is offered by the parties, and none is apparent from the record, as to why Morrow stopped using packing in 1946. Morrow indicated that he started working at Western Electric as a pipefitter's helper and was eventually promoted to pipefitter, but did not specify when that promotion occurred.
[56] Crane suggests that when Morrow identified Crane as the manufacturer of the packing used at Western Electric, he may have been referring to a company known as the Crane Company rather than to John Crane, Inc. Crane points out that one of its employees testified that the Crane Company also manufactured packing but was unrelated to John Crane, Inc. We reject the notion that Morrow somehow confused John Crane, Inc. with another company, and remind Crane that, when asked who made the ring gaskets used at Western Electric, Morrow responded: "Mostly Crane, John Crane Company." It was thus clear that Morrow's references to Crane were, as are ours, short-hand for John Crane, Inc.
[57] We have observed that a Hampshire executive testified that U.S. Mineral stopped selling spray fireproofing to Hampshire in 1959.
[58] Rapid does not direct us to any portion of the 6,108-page record extract that indicates that it specifically requested remittitur, or that it specifically argued that the statutory cap applied to Ciotta's claim. The appellees do not suggest that no such request or argument was made, so we shall assume that the arguments are properly before this Court. We note that our review of the record confirms that Rapid did move for judgment notwithstanding the verdict or, in the alternative, for a new trial on the ground that the awards were excessive. In addressing requests for remittitur in general, moreover. Judge Rombro specifically addressed the awards to Goodman and Ciotta, the only two trial plaintiffs who received verdicts against Rapid. Judge Rombro also remarked generally that "[t]he issue of the damage cap was argued" and that he "held ... that the damage cap does not apply in the trial plaintiffs' cases...."
[59] The argument can apply only to the negligence verdicts. "In a strict liability action, if a product is defective when it was sold by a manufacturer because it lacked a warning of its dangerous characteristics, although it should have had such a warning in light of the state of the art, and if the defective and dangerous product reaches the ... plaintiff without substantial change, middlemen or intermediate sellers of the defective product are strictly liable to the plaintiff user just as the manufacturer is liable to the plaintiff.... This principle, at least at the present stage of the law's development, is fully applicable in a strict liability failure to warn case." Zenobia, 325 Md. 420, 441-42, 601 A.2d 633 (1992) (citations omitted).
[60] Hampshire points out that the judge also informed the jury that "[a] duty to warn is established whenever a reasonable person would want to be informed of the risk in order to decide whether to expose himself to the risk or not." It asserts that "this sweeping instruction erroneously indicated that the jury need not consider whether state of the art knowledge of bystander risk was available to Hampshire at the time of the plaintiffs' alleged exposure." Hampshire ignores that the judge made this statement while instructing the jury on strict liability. It had no bearing whatsoever on the instructions regarding negligence.
[61] Hampshire's closing argument is not reproduced in the record extract.
[62] We ultimately held that the dismissal was proper because the matter was not submitted, as required, for arbitration. Id. at 3-8, 16, 532 A.2d 1081. As we shall explain, we indicated that dismissal on the ground that the transaction involved a service rather than a sale and hence was exempt from the theories of liability alleged would have been proper as well.
[63] As the appellees point out, we emphasized in Roberts that the defendant was a hospital and that the legislature had subsequently acted to exempt blood products from strict liability and implied warranty actions. It was implicit in our opinion, from our heavy reliance on Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954), that we recognized a strong public policy that distinguishes transactions involving medical care from ordinary commercial transactions. In Perlmutter, in which a woman who contracted hepatitis from a blood transfusion sued a hospital for breach of implied warranties, the Court of Appeals of New York remarked:

The art of healing frequently calls for a balancing of risks and dangers to a patient. Consequently, if injury results from the course adopted, where no negligence or fault is present, liability should not be imposed upon the institution or agency actually seeking to save or otherwise assist the patient.
Id. 123 N.E.2d at 795. See also Newmark v. Gimbel's, Inc., 54 N.J. 585, 258 A.2d 697, 703 (1969) (stating, in dicta, that physicians and dentists "must be deemed to have a special and essential role in our society," that "their paramount functionthe essence of their function ought to be regarded as the furnishing of opinions and services," and that "the nature of the services, the utility of and the need for them, involving as they do the health and even survival of many people, are so important to the general welfare as to outweigh in the policy scale any need for the imposition on dentists and doctors of the rules of strict liability in tort"). Contrary to the appellees' suggestion, however, these underlying policy considerations do not nullify our use of the predominant purpose test in reaching our ultimate conclusion that the transaction was predominantly a service rather than a sale.
[64] In Anthony Pools, 295 Md. at 298, 455 A.2d 434, the Court of Appeals held that the so-called gravamen test should be applied where, "as part of a commercial transaction, consumer goods are sold which retain their character as consumer goods after completion of the performance promised to the consumer, and where monetary loss or personal injury is claimed to have resulted from a defect ... even if the transaction is predominantly one for the rendering of consumer services." The gravamen test shifts the focus from the predominant purpose of the transaction to "`whether the gravamen of the action involves goods or services.'" Id. at 296, 455 A.2d 434 (citation omitted). In Anthony Pools, the plaintiffs filed suit over a defective diving board that they purchased pursuant to a contract that also involved the construction of an in-ground swimming pool. The Court explained that the construction of the pool itself was predominantly a service, but that the diving board could have been sold to the plaintiffs in a separate transaction and, under such circumstances, "there would have been an implied warranty of merchantability." Id. at 294, 455 A.2d 434.

The appellees suggest that, if some test should have been applied below, it should have been the gravamen test rather than the predominant purpose test. The appellees do not assert that the character of the fireproofing spray remained unchanged after it was applied. They do not contend that the gravamen of their causes of action concerned the spray itself, and not Hampshire's application of the spray without providing a warning. We therefore reject the appellees suggestion that the gravamen test, rather than the predominant purpose test, was the appropriate test.
[65] Hampshire complains that Judge Rombro erroneously indicated to the jury that supplying asbestos is a basis for liability, when § 402A makes clear that the only basis is selling. The instruction to which Hampshire refers us clearly pertains to negligence and not strict liability.